Addressograph-Multigraph Corporation et al., [1] v. Commissioner. Addressograph-Multigraph Corp. v. Comm'r
Docket Nos. 108181-108187, 111395. United States Tax Court
1945 Tax Ct. Memo LEXIS 310; 4 T.C.M. (CCH) 147; T.C.M. (RIA) 45058; February 5, 1945
*310 Leo H. Hoffman, Esq., 120 Wall St., New York, N. Y., for the petitioners. Laurence H. Bloomenthal, Esq., and W. W. Kerr, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined deficiencies in income tax and excess profits tax as shown in the schedule below. The petitioners will be referred to hereinafter by the abbreviations indicated after each name: *311 ADDRESSOGRAPH-MULTIGRAPH
CORPORATION - A-MC
Docket
Excess
No.
Year
Income Tax
Profits Tax
108181
1934
$ 17,579.12
1935
14,582.91
1936
53,115.36
1937
65,856.86
$10,716.75
$151,134.25
111395
1938
57,352.41
1939
41,924.92
$ 99,277.33
ADDRESSOGRAPH COMPANY - A-Del.
108182
1934
$ 23,035.40
1935
19,508.42
1936
18,540.73
$ 523.66
$ 61,084.55
MULTIGRAPH COMPANY - M-Del.
108183
1934
$ 6,128.21
1935
6,915.33
1936
5,569.91
$ 18,613.45
SPEEDAUMAT MFG. COMPANY - S-Del.
108184
1934
$ 614.50
1935
328.51
1936
263.90
1937
1,035.45
$ 77.65
$ 2,242.36
*312 Respondent also determined that A-MC is liable as a transferee, for the taxes determined to be due from A-Del, M-Del, and S-Del. The correctness of these determinations constitutes the issues in Dockets numbered 108185, 108186 and 108187. A-MC now admits that it is liable as a transferee for whatever taxes and interest may be due from the transferors and has stipulated that these cases be disposed of without trial. No further reference will be made to them herein. Several issues raised by the pleadings have been settled by stipulations or concessions of the parties. Effect will be given thereto in the settlement under Rule 50. Departing from the usual practice of this tribunal, we refrain from making a statement of the several issues at this juncture. There are eleven principal questions; but with the subdivisions and alternatives it will be necessary to divide the discussion into approximately twenty subdivisions. In the interest of clarity therefore, we will make a general statement, after which findings of fact on the several issues will be made, followed by appropriate discussion. The returns of the several petitioners for the taxable years were filed with the collector *313 of internal revenue for the 18th district of Ohio. The petitioners have filed claims for refund of taxes paid for the years 1929 to 1939 as shown in § 22 of the stipulation filed July 6, 1943. At that time the Commissioner had not disallowed any of the claims for the years 1934 to 1939. A-MC was originally organized in 1924 under the name of Addressograph Securities Corporation. During the same year its name was changed to Addressing Machine Securities Co. On September 17, 1929, its name was changed to Addressograph International Corporation and on May 5, 1931, to Addressograph Multigraph Corporation. During most of the taxable years it was the parent of three other companies. It and they were engaged in manufacturing and selling specialty machines and office equipment. A-Del was incorporated in August 1927. For several years preceding the removal of its assets from Chicago to Euclid (Cleveland), Ohio, as hereinafter set out, it was engaged in some phase of the operations of the combined group. M-Del was incorporated December 1, 1930. It was the successor (the word is not here used in a technical sense) of the American Multigraph Co. which had been organized in 1902. The latter *314 company will be referred to hereinafter as M-Ohio. M-Ohio owned all of the stock of American Multigraph Sales Co., International Multigraph Co., Multigraph Sales Co., Ltd. (Quebec), Deutsch Multigraph g.m.b.h. and International Multigraph Co. (Britain), Ltd., which companies will sometimes hereinafter be referred to as the six subsidiaries of M-Ohio. The details of the acquisition of the assets of M-Ohio by A-MC will be shown more fully later. S-Del was incorporated in 1928. It was the successor to the Speedaumat Addressing Machine, Inc. Its manufacturing equipment was in the possession of A-Del in Chicago from 1928 to 1932, and during these years A-Del did both its manufacturing and selling. In 1931 and 1932 all of the equipment of A-Del, S-Del and M-Del was moved to a new plant constructed by A-MC at Euclid (Cleveland), Ohio. The three companies then became selling agencies. A-Del and M-Del were dissolved in 1936 and S-Del was dissolved in 1937. Since then all manufacturing and selling have been carried on by A-MC. Although the three companies were dissolved, they have been continued as legally existing corporations through trustees, by virtue of court orders, for the purpose, *315 inter alia, of carrying on the present litigation. We find all of the stipulated facts to be as stipulated. Unless otherwise indicated, where the word petitioner is used herein, the reference is to A-MC. Issue I What was the cost to petitioner of the assets acquired from M-Ohio and how shall it be apportioned between the depreciable and non-depreciable assets? Findings of Fact In 1930 petitioner became interested in a new offset lithographing process which was then being developed by M-Ohio. This process had many advantages over duplicating machines then on the market and it was the first lithographing process, which had ever been developed, that could be operated by a clerk, stenographer, or other layman. It was then known as "Drylith," and later, after its purchase and further development by A-MC, it became known as "Multilith." Petitioner would have purchased the "Drylith" process without other assets of M-Ohio if it had been possible to do so. M-Ohio, however, refused to sell the process unless all of its assets were purchased. It had spent a great deal of money developing "Drylith," had borrowed rather heavily at the banks, and had experienced some difficulty in raising *316 sufficient capital to complete the development and to place the device on the market. M-Ohio was organized on December 12, 1902. The net income reported in its income tax returns for the years 1924 to 1930 was as follows: 1924
$284,373.26
1925
279,516.86
1926
264,816.33
1927
442,084.90
1928
$517,823.57
1929
507,357.62
1930
195,048.21
M-Ohio never operated at a loss in any year. Its record of past earnings, however, was not the motivating factor in bringing about the purchase of its assets by petitioner. During the three or four months immediately preceding the purchase M-Ohio had been losing money. Despite its record of earnings in prior years, the officers of petitioner considered that its business was "waning." The multigraph machine then being manufactured was a loose-type machine, the operation of which was too expensive for most kinds of duplicating work, and the new lithographic process which was being developed had not reached the manufacturing stage in 1930. Petitioner was primarily interested in acquiring the new process. The parties agreed to negotiate on the basis of the consolidated balance sheet of M-Ohio and its six subsidiaries as of *317 September 30, 1930, after the value of the assets shown on that sheet had been checked by officers of A-MC and found to be substantially correct. M-Ohio owned all of the stock of its six subsidiaries. The September 30, 1930, balance sheet, in condensed form, is as follows: [2]
CONSOLIDATED BALANCE SHEET OF AMERICAN MULTIGRAPH COMPANY
AND SIX SUBSIDIARIES AS OF SEPTEMBER 30, 1930.
American
Six
ASSETS
Multigraph Co.
Subsidiaries
Consolidated
Current assets: Cash in banks and on hand
$ 26,892.39
$ 160,813.50
$ 187,705.89
Accounts and notes
45,310.10
943,462.40
988,772.50
receivable
Less: Reserve for doubtful
(7,755.03)
(7,755.03)
accts.
Inventories
673,726.18
1,048,864.43
1,722,590.61
Less: Reserve for
(9,113.09)
(9,113.09)
obsolescence
Reserve for unrealized
profit on inter-company in-
ventories
(311,777.47)
(311,777.47)
Total current assets
$ 434,151.20
$2,136,272.21
$2,570,423.41
Miscellaneous investments
52,641.72
24.30
52,666.02
Deferred charges and
62,804.54
20,203.80
83,008.34
prepaid expenses
Fixed assets: Land
42,307.44
42,307.44
Buildings
428,195.13
428,195.13
Less: Reserve for
(172,912.81)
(172,912.81)
depreciation
Machinery and equipment
465,502.33
465,502.33
Less Reserve for
(243,179.39)
(243,179.39)
depreciation
Dies, tools and jigs
670,007.27
670,007.27
Less: Reserve for
(125,571.84)
(125,571.84)
depreciation
Patterns and drawings
70,031.99
70,031.99
Less: Reserve for
( 33,922.87)
( 33,922.87)
depreciation
Factory furniture and
69,751.65
69,751.65
fixtures
Less: Reserve for
( 43,808.88)
( 43,808.88)
depreciation
Office and Sales Br. Furn.
52,409.95
179,369.58
231,779.53
and Fixt.
Less: Reserve for
( 29,763.22)
(100,542.51)
(130,305.73)
depreciation
Leased and leasable
76,063.83
578,721.58
654,785.41
equipment
Less: Reserve for
(218,500.52)
( 9,628.09)
(228,128.61)
depreciation
Total net fixed assets
$1,006,610.06
$ 647,920.56
$1,654.530.62
Patents, Application for
293,467.51
24.30
293,491.81
Patents and Development
TOTAL ASSETS
$1,849,675.03
$2,804,445.17
$4,654,120.20
LIABILITIES AND NET WORTH
Current liabilities: Bank loans
$ 100,000.00
$ 100,000.00
Accounts payable
97,582.46
$ 14,952.81
112,535.27
Accrued payrolls, general
58,267.30
30,388.39
88,655.69
taxes, commissions, etc.
Provision for federal
income tax current year to
date
14,485.00
5,900.00
20,385.00
Provision for federal
income tax last installment
for 1929
13,447.14
13,447.14
Supply contract obligations
133,065.45
133,065.45
Total current liabilities
$ 283,781.90
$ 184,306.65
$ 468,088.55
General reserves: For contingencies
75,965.93
75,965.93
For fire loss on field
8,464.99
65,785.88
74,250.87
stock
Total reserves
84,430.92
65,785.88
150,216.80
Inter-Company - Current
($1,732,106.08)
$1,732,106.08
Accounts
Investment in capital stock
( 74,000.00)
74,000.00
of subsidiaries
Investment in capital stock
of subsidiaries
Total investments in
( 74,000.00)
74,000.00
capital stock
Net worth: Capital stock
$2,340,445.00
$2,340,445.00
Earned surplus or (deficit)
947,123.29
748,246.56
1,695,369.85
Total net worth
$3,287,568.29
$ 748,246.56
$4,035,814.85
Total liabilities and net
$1,849,675.03
$2,804,445.17
$4,654,120.20
worth
*318 On November 11, 1930, petitioner made an offer in writing to M-Ohio, which, in so far as here material, was as follows: * * * * *
"In exchange for all assets, tangible and intangible, of your Company, to be transferred to the undersigned or to a wholly owned subsidiary of the Addressograph International Corporation as we may designate, including good will, trade and corporate name; trade marks, patents and applications therefor, and all other assets of every nature whatsoever; we offer to issue and deliver to your Company One Hundred Sixty Thousand Four Hundred and Five (160,405) shares of fully paid and nonassessable common no par value stock of our Company, Addressograph International Corporation, being upon the basis of one and two-fifths (1-2/5ths) shares of the common stock of Addressograph International Corporation for each one (1) share of common stock of The American Multigraph Company, so that each stockholder of said The American Multigraph Company will be entitled to receive for his each said share one and two-fifths (1-2/5ths) shares of the common stock of Addressograph International Corporation; and *319 we will assume and pay the liabilities of your Company, including all merger and reorganization expense, all subject, however, to the following further terms and conditions." * * * * *
The Board of Directors and stockholders of M-Ohio authorized the acceptance of the offer and it was accepted by that corporation under date of November 25, 1930. The fair market value of 160,405 shares of the stock of A-MC on the date of the exchange was $4,170,530. Although good will, trade-marks, and trade and corporate name were mentioned in the offer of November 11, 1930, and were acquired by petitioner, these items were not discussed by the officers who carried on the negotiations and no part of the consideration was specifically allocated to them. Petitioner's president, who was in charge of the negotiations for it, did not consider that it was buying any good will or that the trade-marks, trade brands, corporate name, etc., had any value. The trade name "Multigraph" was added to the corporate name principally because the Multigraph organization and its stockholders wished it to be used. The patents, applications for patents, and development acquired by petitioner consisted of 182 patents *320 exclusive of reissues, 35 patent applications pending, and all rights to the Drylith process in its then state of development. Among the patent applications pending were two filed in August 1930 covering the "Planagraphic printing process" invented by Valentine Dietz. Dietz was the inventor of the Drylith process. After the acquisition of the assets, they were taken over by M-Del which was organized by petitioner for that purpose. No new set of books was opened, the old books of M-Ohio merely being continued and becoming the books of M-Del.
Petitioner made the following expenditures during 1931, all of which were capitalized on its books: Woods, Woods & Aitken
$ 5,010.69
Davies, Auerbach & Cornell
5,317.24
Dustin, McKeehan, Merrick,
Arter & Stewart, Cleve-
land
9,511.22
The Cleveland Trust Co., Fi-
nancial & Trustee Services
6,000.00
First National Old Colony
Corporation
100,000.00
Total
$125,839.15
All of the payments shown above were made for services rendered in connection with the acquisition by petitioner of the assets of M-Ohio and constituted a part of the purchase price thereof. In the deficiency notices (Docket Nos. 108181, 111395, 108183 *321 and 108186), the respondent took the position that the exchange of stock of petitioner for the assets of M-Ohio constituted a nontaxable reorganization so that the basis of the assets in the hands of petitioner was the same as the basis in the hands of the transferor M-Ohio. He now concedes that the transaction constituted a purchase of M-Ohio's assets by petitioner. The total cost of the assets of M-Ohio was: 160,405 shares of stock at $26 per
share
$4,170,530.00
Liabilities assumed
283,781.90
Expenses incident to acquisition
125,839.15
$4,580,151.05
The cost is allocable as follows: Current Assets
$ 434,151.20
Fixed Assets
1,006,610.06
Patents, Patent applica-
tions, etc.
$293,467.51
110,337.50
403,805.01
Miscellaneous Assets
115,446.26
Stock of six subsidiaries
2,620,138.52
$4,580,151.05
OPINION The schedule below indicates how each of the parties would compute the cost of the assets and allocate it among the different classes: Cost
Petitioner
Respondent
Fair market value of
160,405 shares of
A-MC stock at $26
per share
$4,170,530.00
$4,170,530.00
Liabilities M-Ohio as-
sumed
468,088.55
283,781.90
Woods, Woods &
Aitken
5,010.69
Davies, Auerbach &
Cornell
5,317.24
Dustin, McKeehan,
Merrick, Arter &
Stewart
9,511.22
The Cleveland Trust
Co., financial and
trustees services
6,000.00
Fee paid First Na-
tional Old Colony
Corp.
100,000.00
* $4,764,457.55
$4,454,311.90
Allocation of Cost
Patents, application
for patents, and
development
$ 554,045.96
$ 293,467.51
Goodwill, trade-
marks, trade names,
etc.
524,740.00
Stock of six subsidi-
aries
2,195,343.13
Other assets shown on
balance sheet of
Sept. 30, 1930
4,210,411.59
1,440,761.26
$4,764,457.55
$4,454,311.90
*322 The findings show that we partially agree with each of the parties. The first point of difference is on the liabilities assumed. Petitioner takes the consolidated amount, which includes the liabilities of the subsidiaries. We have taken only the liabilities of M-Ohio, or $283,781.90, indicating agreement with the respondent. Petitioner's argument in support of the larger amount rests upon a false premise - that the separate corporate entities may be disregarded. This may be done only in unusual or exceptional circumstances. Cf. Commissioner v. Moline Properties, Inc., 131 Fed. (2d) 388, affirmed 319 U.S. 436; The Raritan Co. of Delaware, Inc., 47 B.T.A. 857, affirmed 136 Fed. (2d) 364, certiorari denied 320 U.S. 753. As will be pointed out more fully later, petitioner purchased the assets of M-Ohio, which included the stock of the subsidiaries. The liabilities of the latter are given full effect in determining the book value of their stock. The evidence pertaining to the services rendered by the three law firms is rather meager. Nevertheless we believe they were *323 of the character ordinarily performed in connection with the purchase by one corporation of the assets and business of another. They consisted of participating in conferences relating to the contemplated action, drafting the plan, preparing resolutions of stockholders and directors, attending meetings, examining state and federal laws, preparing letters, deeds, bills of sale, muniments of title, etc. The services rendered by one of the firms - Davies, Auerbach and Cornell - consisted principally of attending to the details of securing a listing on the New York Stock Exchange for the stock in the new name. Such expenditures are not deductible as ordinary and necessary business expenses. Dome Mines, Ltd., 20 B.T.A. 377. Whether they may be regarded as part of the organization expense in ordinary cases and hence a capital expenditure, need not be decided. Under the present facts we think they were capital expenditures. The agreement between M-Ohio and petitioner obligated the latter to pay "all merger and reorganization expense." Securing a change in the listing, in our opinion, falls within this category. Respondent's suggestion that the adjustment "be deferred until the *324 termination of the corporate existence" is not supported by authorities or logic. We have therefore found and now hold that the amounts paid to the three firms of attorneys constituted part of the cost of the assets. Cf. First National Bank of St. Louis, 3 B.T.A. 807; Emerson Electric Manufacturing Co., 3 B.T.A. 932; Stires Corporation, 28 B.T.A. 1; Victoria Paper Mills Co., 32 B.T.A. 666, affirmed 83 Fed. (2d) 1022. The services rendered by the Cleveland Trust Co. consisted of handling the exchange of the stock - manifestly a necessary incident to the carrying out of the plan. The amount paid to the First National Old Colony Corporation was for services rendered by one of its officers in bringing the officers of the two companies together and in handling negotiations which eventually resulted in the purchase and sale. These services were related to the acquisition of the assets and the amounts expended were capital expenditures. The total cost as computed by us is therefore the amount set out in the findings - $4,580,151.05. Rationalization of our allocation of the cost may be supported in part by a demonstration *325 of the fallaciousness of some of the views and premises of the parties. Petitioner takes the view that M-Ohio and its six subsidiaries must, for present purposes, be treated as one; that since it purchased the assets on the basis of the consolidated balance sheet the amounts shown in the last column, reflecting the consolidated assets and liabilities, must be the basis of the allocation; that no amount was paid for good will, trade-marks, trade names, etc.; and that in computing the total price paid for patents, applications for patents and development there should be included not only the amount shown on the balance sheet ($293,491.81) but also the "General Reserves" ($150,216.80) and the difference between the total price paid and the value of all of the assets ($110,337.35). The aggregate of the items mentioned is $554,045.96. Respondent urges that M-Ohio and its six subsidiaries must be treated as separate entities; that M-Ohio owned all of their stock but did not own their assets; that the amount shown on the balance sheet as patents, application for patents and development ($293,467.51) is the most that may be allocated to those assets; that a substantial amount (computed by *326 him to be $524,740) should be allocated to good-will, trademarks, trade names, etc.; that the aggregate of these amounts, plus the other assets shown on the balance sheet ($434,151.20 + $1,006,610.06 or $1,440,761.26) is all that may be allocated to assets other than stock of subsidiaries; and therefore that the amount to be allocated to the stock of the subsidiaries is the difference between the sum of these amounts and the cost of the assets as he computes it. (See table set out at the beginning of opinion on this issue.) We do not subscribe to petitioner's view that it purchased the assets of the subsidiaries even though they were shown on the balance sheet. Petitioner was interested primarily in securing the new process and the patents and applications for patent upon which it was based. To do so, according to the testimony, it was required to purchase all the assets of M-Ohio, the parent. M-Ohio owned all of the stock of the six subsidiaries. After the purchase petitioner owned all of the stock of the six subsidiaries. They were kept alive for several months thereafter. The fact that a consolidated balance sheet of the seven companies was used is no indication that the assets *327 of the seven separate companies, as such, were being purchased. The purchaser was naturally interested in ascertaining the value of the assets it was acquiring from M-Ohio. One of the principal assets was the stock of the subsidiaries. A correct appraisal of the assets would probably require an elimination of the intercompany accounts; but this is a bookkeeping detail which need give us no concern. The book value of the stock of the six subsidiaries was $2,620,138.52. This amount, in our judgment, is the portion of the cost which should be allocated to such stock and we so hold. The next item, $150,216.80, represents the general reserves of M-Ohio and its subsidiaries as shown on the balance sheet ($84,430.92 and $65,785.88). It is part of the surplus set up on the books as a reserve for contingencies and for fire loss on field stock. At the hearing petitioner undertook to prove that the reserves for doubtful accounts and for obsolescence of inventories were grossly inadequate and that the disparity was at least equal to $150,216.80. Therefore, it says, it should be permitted to increase such reserves at least to that extent. The advantage it seeks to gain by this suggested adjustment *328 is a reduction of the amount paid for accounts, notes receivable and inventories - all non-depreciable assets - and a corresponding increase in the amount applicable to patents, applications for patents and development, depreciable assets. Its argument is not persuasive and the evidence is wholly insufficient to justify any such adjustment. So far as the record shows the responsible officers who negotiated the purchase and sale did so wholly on the basis of the balance sheets and gave full effect to the values shown thereon. The fact that subsequent developments may have indicated that the reserves were insufficient is immaterial. The parties agree that the current assets and fixed assets ($434,151.20 and $1,006,610.06) acquired by petitioner from M-Ohio are as shown in our findings. For some unaccountable reason respondent omits "Miscellaneous Investments $52,641.72" and "Deferred Charges and Prepaid Expenses $62,804.54" both of which have been included by us under the heading "Miscellaneous Assets, $115,446.76". The only item, shown in our allocation of cost, which has not been discussed is the $403,805.01, composed of two amounts allocated to patents and development. The first, *329 $293,467.51, is shown on the balance sheet of the parent and is conceded by respondent to be allocable to patents. Petitioner, in its computation, uses the consolidated amount, $293,491.81. This is erroneous since it includes the $24.30 of the six subsidiaries. The sole amount requiring any discussion, therefore, is the $110,337.50. Before discussing the last-mentioned amount it is appropriate to examine in more detail the computation made by the respondent. He allocates, as shown in the table at the beginning of the opinion, $524,740 to good will, trade-marks and trade names. He introduced in evidence mathematical calculations made by one of his engineer revenue agents, who was called as a witness. The witness took all basic figures from the income tax returns of M-Ohio and its subsidiaries for the years 1924 to 1930 inclusive. He determined the average total assets for the seven-year period, deducted therefrom the average depreciated cost of patents and average indebtedness, and thus determined what he designated as tangibles, including investments. He then subtracted from this amount the average investments, and designated the remainder "tangibles exclusive of investments." By *330 allowing a return on tangibles, exclusive of investments, of 8 percent and a return on other tangibles of 6 percent, he found the total return normally attributable to tangibles to be $274,288. The difference between this amount and the average net income, or $81,712, he characterized as the normal return attributable to intangibles. This amount, capitalized at 15 percent, indicated a value of $524,740 for good will, trade-marks, trade names, or going concern value of M-Ohio. By the application of the same formula to the same factual background, allowing a return on tangibles exclusive of investments of 9 percent, a return on investments of 7 percent, and capitalizing the excess earnings at 15 percent, the witness arrived at a value of $314,000 for good will, trade-marks, trade names, etc. Even though it be assumed that the best evidence of what the excess of cost over assets shown on the balance sheet was paid for would be proof by this mathematical formula of the value of good will, etc., we would still not be convinced that these intangibles had the value attributed to them because of infirmities in the computation. The net income shown on the returns of M-Ohio and its subsidiaries *331 used by the witness was as follows: Net Income
Year
Per Return
1924
$284,373.26
1925
279,516.86
1926
264,816.33
1927
442,084.90
1928
517,823.57
1929
507,357.62
1930
195,048.21 On the basis of these figures the witness arrived at an average yearly net income of $356,000. In evaluating good will and other intangibles by the capitalization of earnings method it is essential that the period selected be representative of the earning ability of the business enterprise involved, and that it fairly reflect probable future earnings. We think there is considerable merit to the petitioner's contention that 1927, 1928 and 1929 were abnormal boom years and should not have been used in the computation. The pre-boom years 1924, 1925 and 1926 disclose that the net income before taxes was only about $274,288, which amount the witness determined to be the return normally attributable to tangibles. Therefore nothing was left to be attributed to intangibles. The net income of $195,048 for 1930 indicates a sharp decline in business which may have been in part due to the beginning of the depression. M-Delaware, the transferee of the business and assets of M-Ohio, sustained *332 losses of $158,133.44 in 1931, $135,689.96 in 1932, and $180,281.68 in 1933. The figures for 1930 to 1933 inclusive lend support to the testimony of the presidents of petitioner and M-Ohio that the business of M-Ohio was "waning" at the time petitioner acquired its assets and business. In any event, we are convinced that at the time of the sale the prospect of earnings, which might reasonably be expected in the future, was not in excess of $274,288 per annum, the amount respondent's witness determined to be the return normally attributable to tangibles. It is apparent, therefore, that we do not agree with the witness that the past earnings and prospects of M-Ohio indicated that it would have earnings in excess of those attributable to tangibles. In our opinion the prospects were that there would be no earnings which could be attributed to intangibles such as good will, trade-marks, and trade names. Under the circumstances we think it is quite doubtful that the good, will, etc., had any value. Our refusal to allocate any amount to good will is justified not only by what has been said but also by the evidence, by logic, and by numerous authorities. Perhaps the case most nearly analogous *333 on its facts is Republic Steel Corporation v. United States, 94 Ct. Cls. 476, 40 Fed. Supp. 1017. In that case, as here, the representatives of the acquiring corporation were interested primarily in securing the patents of the other corporation. They did not consider that the other corporation had any good will separate and apart from the patents, good will was not shown on the balance sheet as a separate item, and the purchaser placed no value on it in determining whether to pay the price demanded. The court held that the only intangible assets regarded by the parties as of any value were the patents; and, since in computing the price to be paid they had given good will no value, "it must be eliminated from consideration in computing the amount paid for the other assets." The evidence is equally strong in the instant case. The officers of both companies testified categorically that good will was never mentioned in the negotiations, that it was not considered to be a separate asset, that all of the value was thought to be attributable to the cash, physical properties, and patents, and that the latter, especially the "Drylith" process, were the assets chiefly desired. Cf. *334 Glenn v. Courier-Journal Job Printing Co., 127 Fed. (2d) 820. Incidentally it may be mentioned that one of the cases upon which respondent placed considerable reliance at the hearing has since been decided against him by this tribunal in a memorandum opinion, largely on the authority of Republic Steel Corporation v. United States, supra.The point need not be labored. We are of the opinion and now hold that all of the excess cost was actually paid for patents, applications for patents, development, etc., especially of the lithographic process, and that no amount may be allocated to good will. We have therefore allocated the entire amount - computed by us to be $110,337.50 - to patents. Issue II The issue as stated by the parties upon brief is whether [*] Commissioner properly disallowed deductions claimed for alleged engineering expenses; whether the petitioners are entitled to a deduction for amortization of alleged patent costs improperly charged to expenses; and whether there is any duplication of deductions. Findings of Fact The basic patents on Addressograph and Multigraph machines have expired; but there have been new improvements and modifications *335 which are protected by patents. At the time of the hearing the petitioners owned approximately 500 patents, including those referred to in the preceding issue. A-MC has maintained an engineering department which develops new products, seeks to improve old ones, and performs other services in connection with assembling new machines and doing preliminary work toward putting them in production. Its subsidiaries, while they were operating companies, maintained similar departments. Petitioners have also engaged outside inventors to develop processes or improvements in the manufactured products and have purchased patents and inventions from inventors not in their employ. During the eleven year period from 1929 to 1939, both inclusive, the engineering departments of the several petitioners employed from thirty to forty people, including engineers and draftsmen. The aggregate cost averaged in the neighborhood of $200,000 per year. Since January 1, 1932, A-MC has done all of the development and manufacturing of products. The engineering departments worked on many projects which did not result in patents and on new products for which no patent applications were filed. Some of the development *336 work was done while applications for patents were pending and such work continued even after patents were issued, in order to obtain a product that would be commercially practicable. In some of the years petitioners deferred on their books a part of the expenditures for engineering and development work, while in other years similar items were treated as business expenses. During the years 1929 to 1933, inclusive, development costs were set up as a deferred item on the books of the petitioners in the following amounts: Addressograph Company
$412,372.91
Multigraph Company
151,289.70
Addressograph - Multigraph
Corp.
13,668.36
Speedaumat Mfg. Co.
24,408.47
Set-O-Type Mfg. Co.
228.75
Total
$601,968.19
Giving effect to corrections which the parties now agree should be made the expenditures made during this period were $524,097.36, allocated as shown in the full page schedule hereinafter set out. The expenditures referred to above were for development of projects which were put into production. Expenditures which did not result in a manufacturable product were charged to expense. During the years 1929 to 1933, inclusive, petitioners claimed on their income *337 tax returns amortization of deferred engineering expenses in the following amounts: Addressograph Company
$178,097.11
Multigraph Company
62,795.97
Addressograph - Multigraph
Corp.
7,973.21
Speedaumat Mfg. Co.
$ 14,863.94
Set-O-Type Mfg. Co.
Total
$263,730.23
During the period 1929 to 1933 inclusive it was the practice of A-MC to amortize the cost of engineering and development on new projects which went into production by a monthly chargeoff based on the estimated life of a particular machine or product. The estimated life used in this connection ranged from 5 to 8 years. The cost of engineering projects which were abandoned and not put into production was spread over a period of 12 months. In December of 1933 the board of directors of A-MC adopted a resolution which provided that this practice be discontinued; that the unamortized balance of engineering and development costs be charged to surplus as of December 31, 1933; and that future engineering and development expenditures incurred be written off currently. The amount charged to surplus on December 31, 1933, pursuant to this resolution, was $338,237.96. This amount has never been restored *338 to capital account on the books of the petitioners. During the years 1929 to 1933 the petitioners' returns showed the following income or loss (bracketed figures represent losses): Year
A-MC
A-Del
M-Del
Total
1929
(264,092.30)
1,604,608.85
1,340,516.55
1930
(36,997.01)
1,414,452.28
1,377,455.27
1931
(83,598.50)
696,087.60
(156,133.44)
456,355.66
1932
(61,066.88)
35,393.26
(135,689.96)
(161,363.58)
1933
(117,103.36)
(51,001.97)
(180,281.68)
(348,387.01)
The losses sustained in 1932 and 1933 were substantially in excess of the amount of amortization for engineering expenditures charged to expenses in those years. The books and records of A-MC and its subsidiaries, and their income tax returns for the years 1929 to 1933, inclusive, were examined by a revenue agent in connection with claims for refund filed for the years 1929 and 1930. In his report to the internal revenue agent in charge at Chicago, the revenue agent computed the tax liability of petitioners for the years 1929 to 1933 inclusive and made various adjustments to net income. In each of those years he treated as allowable deductions the amount of engineering expenses *339 actually incurred. Under date of September 25, 1939, the revenue agent in charge at Chicago wrote a letter to A-MC and its subsidiaries, enclosing a copy of of the revenue agent's report and stating that the adjustments of tax liability recommended by the agent seemed to be warranted. The report of examination indicated no deficiencies for the years 1929, 1931, 1932 and 1933, and a deficiency of $1,889.36 for 1930. Petitioners were later advised by the internal revenue agent in charge that a recomputation disclosed no deficiency for 1930. On June 7, 1941, the Commissioner notified A-MC that its claims for refund for 1929 and 1930 had been disallowed. No taxes were paid by the petitioners and no claims for refund were filed for 1932 and 1933. During the years 1934 to 1939, inclusive, amortization was claimed and deducted for income tax purposes on the unamortized balance of deferred engineering and development expenses charged to surplus on December 31, 1933, in the total amount of $338,009.11. The Commissioner determined that all the amortization so claimed should be disallowed as a deduction. No portion of the amount claimed constituted ordinary or necessary business expenses *340 for the years 1934 to 1939. During the years 1934 to 1939, inclusive, all expenditures incurred for engineering and development work were charged to expense, both on petitioners' books and on the income tax returns filed for each year. In the deficiency notices the following amounts were held to be capital expenditures: (A-MC)
Docket #108181
Year
Explanation
Amount
1936
Cost of patents
$ 391.50
1937
Cost of patents
1,223.30
Docket #111395
1938
Model 1900 Addres-
sograph
$44,058.33
Model 6380 Grapho-
type
2,288.74
New Lister Mod.
900 Addres-
sograph
1,797.45
48,144.52
Patent costs
16,895.57
1939
Model 1900 Addres-
sograph
$23,314.60
Model 6380 Grapho-
type
622.54
No. 104, Attach-
ments, Grapho-
type
2,052.73
25,989.87
Patent costs
16,147.13
(A-Del)
Docket #108182
1934
Cost of patents
$ 1,352.60
1935
Cost of patents
1,096.50
1936
Cost of patents
691.00
(M-Del)
Docket #108183
1934
Cost of patents
180.50
1935
Cost of patents
160.00
1936
Cost of patents
60.00
Total
$112,232.49
On March 10, 1943, motions by petitioners *341 to amend their petitions in dockets 108181, 108182, 108183, and 108184 were granted. The amendments state that petitioners improperly charged to expense many expenditures for acquiring patents and for material, labor and experimental work, developing and perfecting patents, thus understating their patent accounts. Similar allegations were contained in the petition filed in Docket No. 111395. The books and records of the petitioners disclose that during the years 1929 to 1939, inclusive, they expended the total sum of $1,616,083.31, of which they now claim that $1,611,010.10 constitutes patent costs. The expenditures may be divided into the following categories: (1) Purchase of patent and de-
velopment costs
$ 968,461.26
(2) Infringements
19,037.69
(3) Interferences
13,153.32
(4) Salaries of supervising en-
gineers
369,133.66
(5) Salaries of officers and em-
ployees
154,878.41
(6) Legal fees, etc.
91,418.97
$1,616,083.31
Deduct "Parts scrapped,
etc." conceded by peti-
tioners
5,073.21
Balance
$1,611,010.10
The amount of $968,461.26 was expended in connection with the purchase of patents or engineering and development work on the following items: *342 EXPENDITURES 1929 TO 1939,
EXPENDITURES 1929 TO 1939, INCLUSIVE
INCLUSIVE
1929
1930
1931
1932
Graphotype
$ 540.16
$28,201.46
$14,147.61
$11,982.21
5200
1,360.88
6,592.58
Selector
1,952.34
1,420.67
Misc. (Patents)
7,906.72
5,500.00
2,705.12
416.96
Hand Machines
5,159.80
3700
19,713.99
31,267.09
15,261.16
4,401.47
2600
8,437.08
13,707.65
8,736.99
841.01
Lister
2,856.71
2,346.57
1,010.79
3400
3,698.82
2200 (2700)
19,816.00
4,979.00
30,926.35
5600
6,031.68
1100
11,526.20
28,976.40
9,482.36
Drylith & Multilith
68,115.18
51,207.29
5100
3,563.09
935.61
2900
23,055.20
Plates, Frames, Etc.
2,548.21
6380
Plate Ejector (Patent)
900
1900
Computing Machine
40 Duplicator
9000
$51,626.50
$126,409.90
$147,495.34
$135,796.67
EXPENDITURES 1929 TO 1939,
EXPENDITURES 1929 TO
INCLUSIVE
1939, INCLUSIVE
1933
1934
1935
1936
Graphotype
$ 373.62
$ 664.18
$1,070.26
$281.58
5200
Selector
Misc. (Patents)
Hand Machines
3,252.01
3700
4,207.76
3,486.57
10.52
.57
2600
1,342.81
1,060.80
119.00
Lister
3,329.10
763.17
3400
39.66
131.48
1.98
2200 (2700)
8,212.59
14,393.92
1,994.08
1,160.06
5600
1100
9,477.08
26.60
Drylith & Multilith
16,152.48
7,174.51
20,962.94
34,402.36
5100
1,764.65
2900
14,328.35
245.41
$ 465.26
Plates, Frames, Etc.
3,290.13
575.95
6380
327.81
4,602.83
Plate Ejector (Patent)
3,750.00
900
11,124.41
$ 1,471.81
1900
214.25
13,458.07
Computing Machine
20,000.00
19,999.92
40 Duplicator
3,396.81
9000
$62,768.95
$39,309.87
$56,855.37
$74,173.16
*343 EXPENDITURES 1929 TO 1939,
INCLUSIVE
Total
1929 to
1937
1938
1939
1939, Inc.
Graphotype
$2,451.78
$4,351.99
$3,050.42
$67,115.27
5200
7,953.46
Selector
523.94
3,896.95
Misc. (Patents)
16,528.80
Hand Machines
16.19
8,428.00
3700
931.16
79,280.29
2600
34,245.34
Lister
10,306.34
3400
3,871.94
2200 (2700)
512.47
81,994.47
5600
6,031.68
1100
59,488.64
Drylith & Multilith
28,492.43
35,472.57
40,088.97
302,068.73
5100
$ 6,263.35
2900
38,094.22
Plates, Frames, Etc.
6,414.29
6380
4,930.64
Plate Ejector (Patent)
3,750.00
900
$ 2,627.80
$ 4,533.07
$ 461.31
20,218.40
1900
13,282.80
35,464.79
30,583.28
93,003.19
Computing Machine
19,999.92
19,999.92
19,999.92
99,999.68
40 Duplicator
7,287.85
1,422.35
60.33
12,167.34
9000
591.59
1,818.65
2,410.24
$76,110.15
$101,836.28
$96,079.07
$968,461.26
The expenditures listed in the table above do not include any amounts expended in connection with the development by the engineering department of any special machine or special attachment for *344 a customer nor amounts expended in connection with models or other devices on which no patents were applied for or granted. During the period 1929 to 1939, inclusive, approximately 155 patents were issued on the items shown in the schedule above, as follows: Graphotype
5
5200
5
Selector
6
Miscellaneous
10
Hand Machines
1
3700
23
2600, 2650 and 4300
4
Lister
4
3400
7
2200 (2700)
5
5600
3
1100
3
Drylith & Multilith
39
5100
4
2900
2
Plates, Frames, etc.
20
6380
1
Plate Ejector
1
900
5
1900
1
40 Duplicator
6
9000
0
Of the patents referred to above, applications for 95 were filed and 24 were granted prior to 1934. The following additional patents were issued in years subsequent to the taxable years: DRYLITH AND MULTILITH
Application
Filed
Patent Issued
Patent Number
6-10-38
11-5-40
2,220,252
2-8-41
8-18-42
2,293,046
PLATES, FRAMES, ETC.
11-13-38
4-29-41
2,239,847
11-6-40
10-14-41
2,258,624
7-6-40
11-11-41
2,261,993
1-17-41
1-6-42
2,268,679
2-3-41
12-15-42
2,305,127
1-23-41
12-15-42
2,305,195
MODEL 900
5-13-38
1-9-40
2,186,010
MODEL 1900
8-3-40
3-10-42
2,275,439
40 DUPLICATOR
6-11-41
11-17-42
2,302,490
MODEL 9000 AND HOLE PUNCHING
7-28-38
8-20-40
2,211,772
11-8-38
12-9-41
2,265,133
11-8-38
12-9-41
2,265,134
7-31-40
12-9-41
2,265,222
5-31-38
12-9-41
2,265,229
11-8-38
6-30-42
2,288,350
7-28-38
9-22-42
2,296,276
7-28-38
9-22-42
2,296,277
1-9-40
9-22-42
2,296,278
*345 Included in the Drylith and Multilith patents are the following, issued (with the exception of the first) as the result of research and development work conducted at the laboratory of Dr W. B. Wescott at Dover, Mass.
Patent No.
Date Filed
Date Granted
Description
1,893,163
1-3-33
Dietz Process
1,976,039
9-2-32
10-9-34
Plate Etch
1,977,646
9-13-33
10-23-34
Preparation for Actinnic Film
1,992,965
9-19-32
3-5-35
Method of Preserving Film
1,992,966
9-19-32
3-5-35
Dampening Process
2,003,268
9-13-33
5-28-35
Etching Plates
2,007,588
9-2-32
7-9-35
Repellent Inside
2,016,517
9-2-32
10-8-35
Imaging Photo Plate
2,032,770
1-26-34
3-3-36
Plano Plate
2,090,704
8-24-37
Emulsoid Inks*l2,106,368
11-8-35
1-25-38
Graining and
Duplex Plate
2,129,071
10-31-35
9-6-38
Method of Deep Etch
2,134,165
4-3-36
10-25-38
Duplimate
2,147,778
2-21-36
2-21-39
Improvement Duplex Plate
2,205,998
9-1-37
6-25-40
Duplimate
2,208,703
2-21-36
7-23-40
Duplex
2,224,370
2-19-37
12-10-40
Laminating Duplimate
Wescott was employed throughout the period beginning October 15, 1931, and continuing until the hearing. Under the terms *346 of the contract he was "* * * to undertake the collection and correlation of the related old arts and determination of the physical and chemical possibility of the Drylith Proceess as are essential to the formulation of patent specifications to afford adequate protection for the process and product; and to undertake the direction and supervision of the necessary laboratory determinations to accomplish this." In order to carry out the work he was authorized to employ a laboratory technician at $300 per month and an assistant at $100 per month, to expend for outside consultation and supplies and incidentals $125 per month, and to expend for traveling expenses $100 per month. It was agreed that approximately one-half of his time would be spent on the work, for which he was to be paid $700 per month, making a total of $1,325 per month. He was authorized to purchase such equipment as he should deem necessary for the work up to $1,000 and also "patent references up to $500, making a total capital expenditure of $1,500." It was understood that any inventive contributions, useful in connection with the Drylith Process (which subsequently became Multilith) made by him during the term of *347 the contract and for a period of one year thereafter should become the property of A-MC. Under a later contract Wescott was paid an annual retainer fee of $5,000 and out-of-pocket expenses of $4,000. Later his salary became $10,000 per year with the additional obligation upon A-MC to reimburse him "for that portion of the cost of the staff, overhead, and incidental laboratory expenses * * * in connection with the services to be performed * * *." Wescott agreed that during the term of the contract he would not act as consultant, developer, inventor, expert in research or advisor in respect of patents or do any work similar or related to the work covered under the contract for any other corporation, firm or individual engaged in the manufacture or sale of addressing machines or duplicating machines or accessories useful in connection with any such machines. The Dietz process, when acquired from M-Ohio, was not readily marketable because of the effect of temperature, moisture and other weather conditions upon it. Wescott and his assistants made improvements, testing approximately 1100 separate formulas, some of which were patented. He made some trips to the manufacturing plant where *348 he assisted in putting the patented processes into practical operation and also did some work in connection with interferences on patents which had been granted as a result of his work. During the years 1931 to 1933, inclusive, petitioners charged to an account "Drylith Development" $127,086.93. The portion, if any, paid to Wescott during this period is not shown. During the taxable years the amounts shown in the schedule below were expended in connection with the Drylith and Multilith process. Respondent concedes that the amounts shown in the last column are "Part Capital and Part Expense." Part Capital and
Part Expense
1934
Retainer, salary and expenses - Wescott
$ 6,635.04
$ 6,635.04
Developing work on sheet delivery
539.47
1935
Retainer, salary and expenses - Wescott
8,901.70
8,901.70
Experimental model low priced #200
1,260.31
Experimental model and factory
production drawings of num-
bering attachment
453.03
Miscellaneous experiments
236.71
Further development work - aluminum
6,334.57
plate
1936
Retainer, salary and expenses - Wescott
17,490.33
17,490.33
Further development - aluminum plate
9,810.93
Design and prepare drawings improved
3,390.48
inking and reflex unit
Experimental model and factory
production drawings of num-
bering attachment
1,215.42
Production drawings and catalog
1,591.21
Design and build experimental model low
priced duplcating
work
4,677.61
1937
Retainer, salary and expenses - Wescott
24,996.90
24,996.90
Further development - aluminum plate
3,472.70
Improvement to reduce vibration
22.83
1938
Retainer, salary and expenses - Wescott
34,942.10
34,942.10
Experiments - improve and reduce
414.08
vibration
Miscellaneous tests
116.39
1939
Retainer, salary and expenses - Wescott
39,880.49
39,880.49
Experimental work
208.48
$132,846.56
*349 All of the amounts shown in the last column were development or experimental expenses actually paid by the petitioners during the taxable years and a substantial portion thereof represented cost of the patents issued as a result of the work of Wescott and his associates. Prior to March 1928 Henry E. Hubbard had been employed by the Addressograph Company while it was operating in Chicago. His work had consisted of inventing, designing, developing, perfecting and producing machines, devices and accessories manufactured by the company. On March 9, 1928, he and the company entered into a contract under which he agreed to devote his services as inventor, designer and mechanical engineer exclusively to the company for which he was to be paid during the ensuing five years $1,000 per month. A supplemental agreement was subsequently executed requiring him to devote an aggregate of only six months per year "on active duty," and his salary was fixed at $500 per month. On January 29, 1937, an agreement was executed by Hubbard and A-MC providing that Hubbard was to be paid a salary of $3,000 yearly, payable semi-monthly. Under this contract he was required to devote "an aggregate of three *350 months only in each agreement year on active duty." In the event that he should, at the request of A-MC, devote more than three months in any agreement year on active duty, then he was to "be paid for such additional time by an amount proportionate to $3,000 per year, plus his necessary traveling and living expenses during such time, in excess of three months annually." Hubbard was paid the aggregate amount of $31,500 during the period 1929 to 1933, inclusive, and during the taxable years the aggregate amount of $27,698.73 as shown in the table hereinafter set out. A substantial portion of the latter amount constituted development or experimental expenses actually paid by the petitioners in connection with patents. The item "Salaries of Officers and Employees" is composed of $90,669.16 paid during the period 1929 to 1933 inclusive and $64,209.25 paid during the taxable years, a total of $154,878.41 as shown in the following schedule. E.F.
George
W.S.
George
Henry E.
Wm. O.
Richter *
Smith *
Hencke *
Sullivan *
Hubbard **
Belt
1929
$ 3,000.00
$ 503.40
$ 7,500.00
$10,614.03
1930
4,250.00
1,161.66
6,000.00
14,342.79
1931
2,912.50
1,135.87
6,000.00
13,742.91
1932
2,700.00
1,053.00
6,000.00
1933
2,700.00
1,053.00
6,000.00
1934
2,700.00
437.50
$ 86.25
6,000.00
1935
3,150.00
618.13
$ 122.60
6,000.00
1936
5,415.38
998.07
6,115.39
1937
6,000.00
1,432.69
3,583.34
1938
6,000.00
1,750.00
3,000.00
1939
6,000.00
3,000.00
$44,827.88
$5,344.43
$704.38
$6,103.36
$59,198.73
$38,699.73
*351 During the years 1929 to 1939, inclusive, the compensation paid to these individuals was deducted as ordinary and necessary business expenses in the year incurred. The deductions were allowed by the respondent. All of the amounts paid to Richter, Smith, Hencke and Sullivan during the taxable years were ordinary and necessary business expenses. The item "Salaries of Supervising Engineers" is composed of $131,166.85 paid during the period 1929 to 1933, inclusive, and $237,966.81 paid during the taxable years, an aggregate of $369,133.66 as shown in the following schedule: W.R.
W. Gold-
C.J.
R.C.
F.E.
H.C.
Allen
witzer
Hueber
Sandman
Curtis *
Osborn **
1929
$ 5,610.36
$18,681.60
$30,174.11
$ 818.64
$ 9,082.22
$ 66,799.92
to
1933,
incl.
1934
6,000.00
3,603.60
6,000.00
1,673.29
2,012.50
21,249.84
1935
6,000.00
3,603.60
6,000.00
1,892.43
2,275.00
21,249.84
1936
6,115.38
4,231.07
6,115.38
2,446.15
2,446.15
17,083.38
1937
6,467.30
4,859.60
6,703.84
2,784.61
2,728.85
15,000.00
1938
6,300.00
5,700.00
6,600.00
3,000.00
2,925.00
15,000.00
1939
6,300.00
6,000.00
6,600.00
3,000.00
3,000.00
15,000.00
Total
$42,793.04
$46,679.47
$68,193.33
$15,615.12
$24,469.72
$171,382.98
*352 These engineers devoted their time to the development of new products and the improvement of old ones and had several men working under their supervision. Several patents have been applied for and issued in their names with the employer corporation designated as assignee. A portion of the aggregate amount paid to them constituted experimental and development cost of patents. During the years 1929 to 1939, inclusive, petitioners deducted the amounts paid to supervising engineers as ordinary and necessary business expenses. These deductions were allowed by the respondent. The cost of the patents granted to petitioners *353 during the years 1929 to 1933, inclusive, was not in excess of $263,730.23. The total expenditures made by petitioner during the taxable years for salaries of supervising engineers, for engineering and development work on the models shown in the full-page schedule heretofore set out, for experimental and development work on patents, and for salaries of officers and employees who devoted a portion of their time to development work was $624,938.27. Of this amount $359,938.27 constituted ordinary and necessary business expenses and $265,000 constituted patent costs, allocated as shown in the following schedule: 1934
$27,500
1935
27,500
1936
$40,500
1937
45,500
1938
$62,500
1939
62,000
On October 17, 1935, A-MC entered into an agreement with Clyde Smith, an inventor, in which the latter agreed to assign to A-MC all of his right, title and interest in certain applications for patents then pending relating to computing machines. A-MC agreed to pay Smith $5,000 upon the execution of the agreement, and if, on or before November 18, 1935, it formally elected to accept and continue the agreement, it agreed to pay Smith, $15,000 upon receipt of assignments to it *354 of the pending patent applications. The agreement contained the following provisions; "7. Said Smith further covenants and agrees to give during the calendar years 1936, 1937, 1938 and 1939, but only for a period of not more than nine (9) months in any one of these four (4) years, his services and advice as a technical expert to the Company, when requested, and to assist in building at such place or places as the Company may designate any models, machines, apparatus or devices which the Company may decide to build for testing or demonstrating or commercially using his inventions or improvements and for such services and advice the Company covenants and agrees to pay said Smith at the rate of Fifty Dollars ($50.00) per diem and his actual traveling expenses and reasonable living expenses while engaged in the performance of such services. It is understood that said Smith is under no obligation under the provisions of this paragraph to render services elsewhere than on the North American continent. "8. The Company further covenants and agrees that if it shall formally accept this agreement as hereinbefore provided it will thereafter pay to said Smith or his heirs or legal representatives *355 beginning January 16, 1936 and on the first and sixteenth of each month thereafter a semimonthly compensation for services as inventor, of Eight Hundred Thirty-Three Dollars and Thirty-Three Cents ($833.33) until the compensation so paid to said Smith or his heirs or legal representatives shall aggregate the full sum of Eighty Thousand Dollars ($80,000.00) unless this agreement is sooner cancelled by the Company as herein provided. * * * * *
"10. It is mutually covenanted and agreed that after the full sum of the compensation has been paid to said Smith as provided in paragraph 8 hereof the Company shall have the sole right to determine whether or not to drop or to continue in force any application or any patent covered by this agreement but before the compensation has been paid in full to said Smith as provided in paragraph 8 hereof the Company may reassign to said Smith any application or patent covered by this agreement which the Company may elect to drop but reserving to itself, its successors and assigns, a free and non-exclusive license to make, use and sell the invention or improvement forming the subject matter of such application or patent, and upon such reassignment *356 all obligations of the Company with respect to the application or patent reassigned shall cease and determine. * * * * *
"1. It is also mutually covenanted and agreed that the Company shall have the right to dispose by sale, license or otherwise of all or any right in or to all or any of the inventions, improvements, applications or patents covered by this agreement to any person or persons, firm or corporation in the United States or foreign countries but before the full sum of the Compensation has been paid by the Company to said Smith as provided in paragraph 8 hereof no such disposition shall be consummated without first obtaining the consent in writing of said Smith thereto. * * *" * * * * *
As a result of this agreement, A-MC acquired the following patents: Patent
Date
Patent
Date
number
Granted
number
Granted
2,077,962
4-20-37
2,176,930
10-20-39
2,077,963
4-20-37
2,176,931
10-20-39
2,077,964
4-20-37
2,176,932
10-20-39
2,077,965
4-20-37
2,176,933
10-20-39
2,176,929
10-20-39
2,176,934
10-20-39
Payments were made to Smith as follows: 10-18-35
$ 5,000.00
12-7-35
15,000.00
1936
19,999.92
1937
19,999.92
1938
19,999.92
1939
19,999.92
Total
$99,999.68
*357 The last four amounts were paid to Smith in semi-monthly payments of $833.33 and deducted by petitioner as part of its annual development expenses in 1936 to 1939, inclusive. The payments made in 1935 aggregating $20,000 were charged off at the rate of $5,000 per year during 1936, 1937, 1938 and 1939 as amortization of the ten patents. The amount of $99,999.68 is shown in the fullpage schedule set out above on the line "Computing machines" as a part of the expenditures totalling $968,461.26. All of it was paid for the purchase of the ten patents and none of it constituted ordinary or necessary business expenses. After the execution of the agreement in 1935 Smith was called upon once or twice to render services in a special matter and was paid $50 per day and expenses upon rendition of bills as provided in Clause 7. The amounts so paid were ordinary and necessary business expenses and were so treated by petitioner. None of them are included in the expenditures shown in the schedule above. Included in the $968,461.26 referred to above is an amount aggregating $16,528.80 for the purchase of what the parties designate as "Miscellaneous Patents". The patent number, date issued, *358 inventor, cost and amortization claimed 1929 to 1933, inclusive, are shown in the following schedule: Amortization
Date
claimed 1929
Patent No.
Granted
Inventor
Cost
to 1933
1,550,259
8-18-25
Jackson
$ 1,040.00 *
$1,040.00
1,682,188
8-28-28
Schaffer
4,666.72 *
2,499.60
2,050,310
8-11-36
Burroughs
2,200.00
2,200.00
1,920,001
7-25-33
Chambers
500.00
500.00
1,807,562
5-26-31
1,832,007
11- 7-31
Young
5,000.00
1,260.00
1,860,124
5-24-32
Attachment
Hoffman
2,205.12
480.00
1,811,815
6-23-31
Anthony
500.00
320.00
Murray
416.96
150.00
$16,528.80
On January 1, 1934, the unamortized cost and the remaining life of the miscellaneous patents was as follows: Unamortized
Remaining
Inventor
Cost
Life
Schaffer
$2,167.12
11 2/3 years
Young
3,740.00
15 5/12 years
Anthony
180.00
14 1/2 years
No patents were granted on the inventions purchased from Hoffman and Murray. In its *359 income tax returns for the years 1934, 1935 and 1936 petitioner deducted the whole of each amount (one-third each year) as amortization. It also treated the remaining portions of the Hoffman and Murray expenditures ($1,725.12 and $266.96) similarly. The following legal fees were paid by petitioners in connection with patents and patent applications: 1931
$ 5.543.50
1932
5,768.01
1933
10,661.65
$21,973.16
1934
8,874.05
1935
7,192.17
1936
11,185.28
1937
14,682.90
1938
15,654.01
1939
11,857.40
69,445.81
Total
$91,418.97
The legal fees, aggregating $69,445.81, paid by petitioners during the years 1934 to 1939, inclusive, were treated as business expenses and deducted in the year incurred. Petitioners made the following expenditures in connection with patent interference or infringement litigation: Year
Item
Description
Amount
1931
Printing Process
Legal fees, etc. Multigraph suit
against Nitchke
Bros.
$ 3,132.90 *
1935
Model 3700
Infringement suit by Elliott
Addressing Ma-
chine Company
2,437.50 *
1935
Computing Machine
Legal fees, etc. patent
3,096.97
interference
1936
Model 3700
Infringement suit by Elliott
Addressing Ma-
chine Company
1,167.64 *
1936
Computing Machine
Legal fees, etc. patent
1,746.45
interference
1936
Lister
Legal fees, etc. patent
106.13
interference
1937
Model 3700
Infringement suit by Elliott
Addressing Ma-
chine Company
12,299.65 *
1937
Computing Machine
Legal fees, etc. patent
3,943.23
interference
1937
Lister
Legal fees, etc. patent
510.09
interference
1938
Computing Machine
Legal fees, etc. patent
3,452.80
interference
1939
Computing Machine
Legal fees, etc. patent
297.65
interference
$32,191.01
*360 The expenditures shown above were treated as ordinary and necessary business expenses in the years incurred. Opinion Petitioners contend they are entitled to amortize, as patent costs, expenditures aggregating $1,611,010.10. The claimed patent costs fall into several categories. First petitioners contend that all expenditures shown in the full page schedule set out in our findings (except for the miscellaneous patents and those issued to Clyde Smith on the computing machine) really constituted the cost of the 155 patents issued on the Graphotype, Model 5200, Selector and the other models or processes. Second it is contended that the amount paid to Clyde Smith for the ten patents acquired from him and the amounts paid to others for miscellaneous patents constituted the cost of those patents. Third it is contended that the legal fees, the amounts expended for infringement suits, and the amounts expended for interferences should be added to the expenditures referred to under the first subdivision; and finally it is urged that very substantial *361 amounts paid to supervising engineers and officers should also be added. For convenience the second and third contentions will be discussed first. The amounts involved, in the order of discussion, are as follows: Cost of Clyde Smith patents
$ 99,999.68
Cost of miscellaneous patents
16,528.80
Legal fees
91,418.97
Expenses - Infringement Suits
19,037.69
Expenses - Interferences
13,153.32
Salaries of Supervising Engineers
369,133.66
Salaries of Officers and Employees
154,878.41
Other expenditures - 1929 to 1939,
incl.
846,859.57
$1,611,010.10
Clyde Smith Patents The pertinent portions of the contract with Smith are shown in our findings. Under it petitioner acquired the 10 patents shown. Smith was paid approximately $100,000 ($99,999.68) at the rate of $20,000 per year. Petitioner treated the first $20,000 payment as a capital expenditure in 1935 and amortized it over the four succeeding years at the rate of $5,000 per year. The remaining payments, aggregating approximately $80,000, were treated as ordinary and necessary business expenses in the years paid. ($19,999.92 in each of the years 1936 to 1939.) Respondent concedes that at least the initial *362 $20,000 payment represents cost of a capital asset and that it should be amortized over the lives of the patents, allocating it 4/10th to the patents issued in 1937 and 6/10th to the patents issued in 1939. Petitioner now concedes that this is proper. The parties disagree as to the treatment to be accorded the $80,000 respondent insisting it was properly treated by petitioner as ordinary and necessary business expenses and petitioner insisting it should be treated the same as the $20,000 payment made in 1935. We agree with petitioner. The contract indicates that two types of payments were to be made to Smith - $50 per day and expenses for special work to be done as provided in paragraph 7 and an aggregate amount of $100,000 if the company elected to become the associate owner of the ten patents. The payments made under paragraph 7 were relatively insignificant and are not in issue. The evidence indicates Smith was called upon once or twice to perform some special work and was paid as provided in paragraph 7 upon rendition of his bill. The amounts so paid were charged to expense and respondent has made no adjustment. The payments to be made under paragraph 8 were, we think, part *363 of the cost of the 10 patents. It will be noted that they were required to be made to "Smith or his heirs or legal representatives" if the company should "formally accept" the agreement. The payment of $15,000 upon receipt of the assignment of the patents (in addition to the $5,000 payment made when the contract was signed) was such acceptance. Thus the $80,000 was to be paid unless the agreement should be cancelled. Cancellation of the agreement by the company before the entire amount was paid would result, under paragraph 9 of the contract, in a forfeiture of all amounts previously paid, "to said Smith or his heirs or legal representatives and the company shall return and reassign" the patents. Under paragraph 11, while the company had a qualified right to sell, license and otherwise dispose of its rights under the patents, no such disposition could "be consummated without first obtaining the consent in writing of said Smith thereto" before "the full sum of the compensation has been paid by the company to said Smith as provided in paragraph 8 * * *." Under paragraph 12 the company was required to "satisfactorily and vigorously prosecute and maintain in force * * * all the patents, *364 applications for patents, and all interferences, oppositions, annulments and other proceedings in which such applications or patents may be or may become involved" * * * "until the entire sum of Eighty Thousand ($80,000) is paid as provided in paragraph 8 * * *." These provisions convince us that the $100,000 ($99,999.68) represented the cost of the ten Smith patents and we so hold. It follows that the deductions heretofore allowed as ordinary and necessary business expenses and the amortization heretofore claimed must be disallowed and the aggregate amount of $99,999.68 be amortized as follows: 1/17th of 4/10 during each year commencing in 1937, and 1/17th of 6/10 during each year commencing in 1939. Miscellaneous Patents The cost of the 8 patents acquired from Jackson and others, including the assignment by Hoffman and Murray of "inventions" without patents, aggregated $16,528.80. Petitioner contends that the entire amount - with the possible exception of the Hoffman and Murray items - should be amortized over the lives of the eight patents. Its position with respect to the Hoffman and Murray items has been vacillating. During the trial it stated claim for amortization of *365 the amounts waived. Later respondent stated he conceded the amounts were "capital expenditures"; so petitioner upon brief reasserts a claim for amortization of the entire amount. We need give the claim for amortization of the Hoffman and Murray expenditures but slight consideration. No authorities have been cited and we know of none authorizing amortization of a right to use unpatented and probably unpatentable, inventions. We therefore eliminate the Hoffman and Murray amounts from consideration, assuming arguendo that petitioner may be permitted to withdraw its concession as to them. The schedule shown in our findings indicates that petitioners claimed in their returns for 1929 to 1939, as amortization of three of the patents, the entire unamortized cost. Thus, at the beginning of the taxable years the unamortized cost of the remaining patents (Schaffer, Young and Anthony) was $6,087.12, which respondent concedes is amortizable over the lives of the patents. Petitioner insists that the entire $16,528.80 - or in any event that amount less the Hoffman and Murray items - should be amortized over the lives of the several patents, allocating to the years 1929 to 1933 inclusive only *366 the amounts which should have been claimed during those years rather than the amounts claimed. Petitioner, apparently recognizing the applicability and force of Virginian Hotel Corporation of Lynchburg v. Helvering, 319 U.S. 523, insists that the claimed amortization had not been "allowed." Inasmuch as the same argument is made in connection with the other expenditures aggregating $846,859.57 and especially the portion thereof aggregating $263,730.23 claimed during the years 1929 to 1933 inclusive as deferred engineering expenses, the court, at a hearing held subsequent to the trial and to the filing of some of the briefs, suggested that the record did not disclose whether the claimed deductions had, or had not, actually been allowed and indicated a willingness to receive additional evidence on that point. Thereafter on May 8, 1944, the parties filed a supplemental stipulation of facts referring to certain claims for refund and explanatory letters and reports. While some of the facts shown by these documents have been set out in our findings, we now indicate more fully the essence of the showing made. Claims for refund for the calendar years 1929 and 1938 had been *367 filed at a time prior to March 29, 1934. On that date A-MC filed a claim for refund for the calendar year 1931. The refund claims were based upon the alleged right of A-MC to take additional depreciation on "cost values to the corporation of plant properties, based on appraisal at June 30, 1927." A-MC was contending that on June 30, 1927, it had acquired certain properties from A-Illinois by purchase rather than in a non-taxable reorganization, so that it was entitled to a stepped-up basis for depreciation purposes. It was advised by the Commissioner of the disallowance of its claims for refund on the following dates: Original claim rejected
Amended claim rejected
1929
1930
June 7, 1941 (Ex. 77)
November 10, 1942 (Ex. 79)
1931
June 22, 1934 (Ex. 75)
July 20, 1942 (Ex. 80)
In connection with the claims for refund the books of A-MC and its subsidiaries were examined by a revenue agent and he reported to the internal revenue agent in charge at Cleveland on April 19, 1939, that a reexamination of the books for the years 1929 to 1931 inclusive, and an original examination for the years 1932 and 1933 disclosed no deficiency in tax for the years 1929, 1931, *368 1932 and 1933, and a small deficiency for 1930. The deficiency for 1930 was later found to be in error. The agent in his report did not specifically allow or disallow amortization of engineering expenses incurred in connection with the yearly creation of new models. However he did increase deductions for each year by the following amounts of engineering expenses: A-MC
A-Delawre
M-Delaware
Total
1929
$36,405.67
$ 36,405.67
1930
79,201.84
79,201.84
1931
42,624.38
$54,492.15
97,116.53
1932
65,955.26
32,426.86
98,382.12
1933
6,486.72
1,574.72
8,061.44
Total
$319,167.60
In arriving at the above amounts the agent subtracted the amount of amortization deducted each year from the amount of the engineering expense incurred in that year, thus giving petitioners the benefit of the entire amount of engineering expense incurred as a deduction. No claims for refund were filed for the years 1932 and 1933 because substantial losses were sustained in those years. Nevertheless the agent's examination covered all of the years 1929 to 1933 inclusive. It is not clear from an examination of his report just how he treated the deductions *369 taken for amortization of miscellaneous patents in the years 1929 to 1933 inclusive. In his report he speaks about the practice of the company in deferring its engineering expenses "incurred in connection with the yearly creation of new models", pointing out that the proration of this expense was based on the selling life ofthe models. This statement may indicate he did not treat similarly the "Miscellaneous Patent" expense. No such conclusion, however, is justified under the meager evidence. Then again, evidence that a revenue agent adjusted items of income and dedutions for various years in a report covering his examination of the income tax returns of a taxpayer in connection with claims for refund, even when considered in conjunction with evidence showing that the Commissioner disallowed the claims for refund, does not necessarily establish that the action of the Commissioner in rejecting the refund claims was based upon the report of the revenue agent. Petitioners never had any statement from the Commissioner that he had disallowed these deductions. "In cases where revenue agents' reports are offered in evidence, they cannot be regarded as proof of what the Commissioner did unless *370 they are in some way identified with the determination of the Commissioner." Henry Wilson, 16 B.T.A. 1280, 1283. Our conclusion is that petitioners have failed to show that the deductions for amortization of miscellaneous patents claimed by them for the years 1929 to 1933 inclusive were disallowed. Since for aught that appears in this record they have been allowed, under the rationale of Virginian Hotel Corporation of Lynchburg v. Helvering, supra, the amount of amortization that may be taken in 1934, and subsequent years is the unamortized balance as of January 1, 1934. We therefore approve respondent's computation, under which petitioners are allowed amortization aggregating $6,087.12 spread over the lives of the Schaffer, Young and Anthony patents. Legal Fees At the hearing respondent conceded that legal fees aggregating $931,418.97, paid by petitioners in connection with patents and patent applications, were properly capitalizable. He limited his allowance of amortization, however, to the legal fees of $69,445.81 paid during the taxable years 1934 to 1939, inclusive, and refused to concede that amortization was allowable during the taxable years *371 on legal fees of $21,973.16 paid during the years 1931 to 1933, inclusive, on the ground that the evidence does not disclose whether these amounts were charged to expense in the years in which incurred or whether they were deferred and amortized, and on which company's books they appear. An examination of the consolidated income tax returns filed by petitioners for the years 1931 to 1933, inclusive, discloses that the following were included in the deductions taken in computing consolidated net income or loss: Year
Description
A-MC
A-Delaware
M-Delaware
1931
Patent expense
$24,785.22
$24,443.09
1931
Legal and professional fees
$28,259.86
26,270.61
9,352.36
1932
Patent expense
5,544.83
17,069.07
5,755.97
1932
Legal and professional fees
17,187.15
7,623.20
100.00
1933
Patent expense
579.81
25,785.13
5,065.29
1933
Legal and professional fees
27,716.92
15,311.97
7,973.78
We have no way of knowing what part, if any, of the payments for legal services in the amount of $21,973.16, made during the years 1931 to 1933 inclusive, should be allocated to A-MC and how much should be allocated to A-Delaware and M-Delaware. Moreover, *372 we cannot ascertain with any degree of accuracy whether any of the payments were charged to expense or whether all, or part of them, were deferred and amortized. All of the subsidiaries of A-MC filed separate returns for the years 1934, 1935 and 1936. It is therefore important to know how much of the expenditures in 1931, 1932 and 1933 is attributable to each corporation. Since the basic facts have not been shown we are compelled to hold that no part of the payments made during those years may be deducted during the years 1934 to 1939 inclusive. Respondent concedes that the $69,445.81 paid by petitioners during the years 1934 to 1939 inclusive may be amortized over a 17 year period. It is so held. Expenses - Infringement Suits and Interferences The evidence pertaining to the expenses of infringement suits and interferences is quite meager. A revenue agent who examined the books and records of petitioners during a recess of the trial testified that they plainly indicated the expenditures were made and that they were either for infringement suits or interferences, some of which were brought by, and some of which were brought against, petitioners. Evidence aliunde established that *373 $19,037.69 represented the cost of infringement suits and $13,165.32 interferences. The questions arising in connection with these expenditures are not discussed very fully by either party. Respondent asserts that they are not amortizable as patent costs and petitioner asserts that they are. Interference proceedings before the officers of the patent office are too well known in the law to require any extended discussion. Such a proceeding is clearly for the acquisition or protection of a capital asset. It has nothing to do with income. Hazeltine Corporation, 32 B.T.A. 110, 122. Affirmed on this point Hazeltine Corporation v. Commissioner, 89 Fed. (2d) 513. Cf. Morgan Jones Estate, 43 B.T.A. 691, affirmed 127 Fed. (2d) 231; Central Material and Supply Co., 44 B.T.A. 282, affirmed 126 Fed. (2d) 542. The expenditures for interferences aggregating $13,165.32 must therefore be capitalized. Infringement proceedings are for the protection of an incorporeal right secured by a patent or copyright against a trespass - to afford redress against one who, without legal permission, shall make, use or sell to another *374 to be used, the thing which is the subject of the patent. Bouvier's Law Dictionary (Rawle's Third Revision) Vol. 2, p. 1565. Such redress may be sought in an action at law to recover damages for the injury inflicted Carver v. Hyde, 16 Pet. 513 or, in a proper case, in equity where the relief granted may also include an injunction to restrain future acts which may result in irreparable injury. Waterman v. Mackenzie, 138 U.S. 252. No hard and fast rule can be laid down as to whether the expenditures in such suits are capital in their nature or are ordinary and necessary business expenses within the rationale of such cases as Welch v. Helvering, 290 U.S. 111 and Deputy v. Dupont, 308 U.S. 488. The question is essentially one of fact. The expenditures set out in our findings in connection with the infringement proceedings, for the most part, seem to have been made in defending such suits. We know little else about them. Three of the suits appear to have been brought by Elloitt Addressing Machine Co. and, on the exhibits introduced in evidence, it is indicated that each had some relation to Model 3700. On this particular model 22 patents *375 had been issued between 1933 and 1938. Just which, if any, is affected by each suit is not shown; nor do we have any additional knowledge as to the relief sought or secured by plaintiff. The fourth expenditure (the first shown in our schedule) appears to have been made for "legal fees" in a suit brought by M-Del in 1931 involving a "printing process." Here again we have no evidence indicating that it had anything to do with the acquisition or protection of a capital asset. Petitioner has not sustained its burden of showing that the respondent erred in determining that the amounts expended in the infringement suits were ordinary and necessary business expenses. Salaries of Engineers, Salaries of Officers and Other Expenditures The last three items shown in the schedule at the beginning of the discussion on this issue may be considered together. They are: 1929 to 1933
1934 to 1939
Total
Salaries of Supervising Engineers
$131,166.85
$237,966.81
$369,133.66
Salaries of Officers and Employees
who, petitioners
claim, devoted greater portion of
their time to
Patents,
90,669.16
64,209.25
154,878.41
and,
Other Expenditures - 1929 to 1939,
inc. Shown in full-
page schedule in our findings
524,097.36
444,363.90
968,461.26
*376 The cost of the Clyde Smith patents ($99,999.68), the cost of the miscellaneous patents ($16,528.80), both heretofore discussed, and an additional amount of $5,073.21 originally claimed by petitioner but later abandoned, have all been included in the $444,363.90 shown in the schedule above. Eliminating then the amounts in issue under the last item shown above are $524,097.36 for the first period and $322,762.21 for the last or an aggregate of $846.859.57. Before discussing the evidence and the contentions of the parties it is appropriate to outline what occurred before the notices of deficiency were issued and the proceedings were initiated. Petitioners' books seem to have been kept upon a method which reflected - with the exception of salaries of supervising engineers and of officers and other employees who may have devoted a portion of their time to patent matters - the cost of developing various models and processes. The comptroller of the companies, who testified several times and at length before us during the extended hearing, outlined the method of procedure substantially as follows: Before anything is done (upon a contemplated project) somebody brings up an idea. Perhaps *377 our sales agents in the field, who have contact with customers, and they make suggestions of certain ideas and machines that perhaps would be useful and there would be a demand in the market. After that step * * * there are meetings and discussions between management an the engineering department and so on of certain developments in or refinements or improvements to our present machines. After it reaches the concrete stage management wants to know approximately how much that type of development would cost and in order to have an answer our engineering prepares estimates. Based on those estimates an appropriation is prepared, giving a brief description of the project with an estimate of cost. Then the management approves or disapproves it. If approved an order number is assigned. When the cost department receives the time tickets of the engineers they know where to charge the cost to. The costs used to be accumulated on the back of the appropriation form but about 1932 or 1933 I devised a new appropriation cost sheet. The costs are accumulated on such cost sheets. When the work is completed on any given development the figures are posted to a general ledger account, with journal voucher *378 closing out the appropriation. When closing is made it is charged either to engineering expenses or reserve for engineering. On the basis of the records, kept as indicated above, petitioners during the years 1929 to 1933 inclusive set up on their books as a deferred item, allocated to the various models, as shown on the full-page schedule set out in our findings, the amount of $601,968.19. During the same period they claimed amortization aggregating $263,730.23. This left, on the basis of the figures used, an apparent unamortized balance of $338,237.96. (If the correct aggregate of $524,097.36 had been used the unamortized balance would have been $260.367.13.) In the returns for 1934 to 1939, inclusive, "Amortization of Deferred Engineering Expenses" in the aggregate amount of $338,009.11 was claimed, all of which was disallowed by the respondent. During the same period all expenditures incurred for engineering and development work were charged to expense, both on petitioners' books and on their income tax returns. The Commissioner allowed the major portion of the amounts so claimed although some of the expenditures, which were obviously for the development of "models", were held *379 to be capital expenditures. In the original petitions the disallowances of the deductions claimed for amortization were charged as error. After issue had been joined petitioners asked and were granted leave to file amendments to their petitions. The substance of the amendment in each case is that the petitioner had improperly charged to expense many expenditures for acquiring patents and for material, labor and experimental work in developing and perfecting patents, thus understating their patent accounts in substantial amounts. The evidence was directed toward establishing the charge of error contained in the amendments. Since the items in issue have all been consolidated in the exhibits, A-MC will, throughout the discussion of this issue, be referred to as the petitioner. Preceding the trial, petitioner's comptroller prepared a schedule which bears the caption "Cost of U.S. Patents Charged off to Expenses Properly Capitalizable and Amortization Thereon." On this schedule (received in evidence as Exhibit 1 and, as modified, also as Exhibit 21) he listed the numbers of the various patents acquired by A-MC and its subsidiaries during 1929 to 1939 inclusive - except those discussed *380 under Issue I - the dates the patents were granted, the name of the machine, model, device or process in which incorporated, the amount of alleged "additions to patents" during later years, and the amortization which he determined to be allowable. The latter amount was carried into a schedule designated "Amortization of Patents", the essence of the theory and contention being that the aggregate amount should be recovered over a 17 year period. The comptroller testified that in preparing the schedule he had gone through and made a full analysis of the engineering and expense accounts and referred to all the explanatory notes in the journal entries pertaining to the type of machine, model, etc., on which the money had been spent. The books contained no reference to patents; but the witness satisfied himself as to the machine in which each had been used and allocated the aggregate cost to the several patents. A typical illustration is the handling of the first item shown in the full-page schedule in our finding - "Graphotype." The total amount expended on this machine, according to the witness' interpretation of the books, was $67,115.27, as follows: 1929
$ 540.16
1930
28,201.46
1931
14,147.61
1932
11,982.21
1933
373.62
Total
$55,245.06
1934
$ 664.18
1935
99.49
1936
1,252.35
1937
832.29
1938
5,971.48
1939
3,050.42
Total
$11,870.21
*381 He (and petitioner) would now evolve - retrospectively - a schedule of amortization of patents as follows: ADDITIONS TO PATENTS INCURRED IN THE YEARS l
1929
1930
1931
1932
1933
Patent #1,868,777 - Granted
108.03
5,640.29
2,829.52
2,442.28
7-26-32
Patent #1,893,463 - Granted
108.03
5,640.29
2,829.52
2,467.34
1-3-33
Patent #1,930,058 - Granted
108.03
5,640.29
2,829.52
2,416.44
10-10-33
Patent #1,961,156 - Granted
108.03
5,640.29
2,829.52
2,399.94
6-5-34
Patent #2,115,455 - Granted
108.03
5,640.30
2,829.53
2,396.45
4-26-38
Total
540.16
28,201.46
14,147.61
11,982.21
ADDITIONS TO PATENTS INCURRED IN THE YEARS l
1929
1934
1935
1936
1937
Patent #1,868,777 - Granted
74.72
132.83
19.90
250.47
7-26-32
Patent #1,893,463 - Granted
164,22
132.83
19.90
250.47
1-3-33
Patent #1,930,058 - Granted
119.72
132.83
19.90
250.47
10-10-33
Patent #1,961,156 - Granted
84.73
166.84
19.90
250.47
6-5-34
Patent #2,115,455 - Granted
74.73
132.84
19.89
250.47
4-26-38
Total
373.62
664.18
99.49
1,252.35
ADDITIONS TO PATENTS INCURRED IN THE YEARS l
1929
1938
1939
Patent #1,868,777 - Granted
166.45
1,194.29
610.09
7-26-32
Patent #1,893,463 - Granted
166.46
1,194.29
610.09
1-3-33
Patent #1,930,058 - Granted
166.46
1,194.30
610.08
10-10-33
Patent #1,961,156 - Granted
166.46
1,194.30
610.08
6-5-34
Patent #2,115,455 - Granted
166.46
1,194.30
610.08
4-26-38
Total
832.29
5,971.48
3,050.42
*382 AMORTIZATION TO BE ALLOWED
1932
1933
1934
1935
Pat. Granted 7-26-32
283.62
650.58
657.24
662.34
Pat. Granted 1-3-33
654.75
663.99
668.91
Pat. Granted 10-10-33
145.27
657.82
662.60
Pat. Granted 6-5-34
661.90
Pat. Granted 4-26-38
AMORTIZATION TO BE ALLOWED
1936
1937
1938
1939
Pat. Granted 7-26-32
672.60
688.98
749.70
833.32
Pat. Granted 1-3-33
678.87
694.83
753.45
834.45
Pat. Granted 10-10-33
672.02
687.02
741.80
817.28
Pat. Granted 6-5-34
670.84
685.12
737.02
808.42
Pat. Granted 4-26-38
502.88
773.40
Apparently petitioner would brush to one side and have us ignore all that had been done in years prior to the taxable years involving expenditures which it now contends should be amortized as capital costs. This includes not only the $524,097.36 expended during 1929 to 1933, inclusive, in the development of the various models but also the $131,166.85 of supervising engineer's salaries and the $90,669.16 paid to officers and other employees. A brief discussion of the "Graphotype" expenditures, together with what has been said in connection with "Miscellaneous Patents", *383 much of which is apposite, will demonstrate the fallacy of petitioner's present contention. All of the expenditures made on the "Graphotype" during the years 1929 to 1933 aggregating $55,245.06 were included in the $601,968.19, set up on petitioner's books during those years as a deferred item. A proportionate part of it had therefore been claimed when amortization of deferred engineering expenses in the aggregate amount of $263,730.03 had been deducted in the returns for those years. If the amount so claimed was "allowed," as respondent contends and as the record seems to indicate, then the total amount to be allowed in later years could not exceed the difference between the cost basis and the amount previously allowed. Petitioner makes several assumptions that are not justified by the evidence. The first is that the total amount expended in developing the model should, for present purposes, be construed to be the cost of the five patents ultimately secured and used in it. This overlooks the fact that unpatentable ideas as well as patentable ones, and, more likely than not, patents which had expired, had been used in developing the model. Another is that the amounts claimed had *384 not been "allowed." In this connection the sole evidence relied upon is the action of the revenue agent in recommending rejection of the claims for refund, as related in our discussion on the "Miscellaneous Patents." As pointed out by the Supreme Court in Virginian Hotel Corporation of Lynchburg v. Helvering, supra, "* * * there is no machinery for formal allowances of deductions from gross income. Deductions stand if the Commissioner takes no steps to challenge them. * * * If the deductions are not challenged, they certainly are 'allowed' since tax liability is then determined on the face of the returns." But while we believe the evidence indicates that the amounts claimed were actually allowed, the point in our judgment need not be labored. Petitioner is impaled upon the longer horn of a dilemma if we should conclude that the claimed deductions had actually been "disallowed" upon the basis of the action of the revenue agent; for he increased the deductions theretofore claimed and allowed by $319,167.60 for engineering expenses. Another assumption made by the petitioner is that neither the filing of an application for a patent nor its issuance should be taken as the *385 terminus for the purpose of computing cost. Thus it is noted that although three of the five patents used in the "Graphotype" had been granted in 1932 and 1933, petitioner charges against them for present purposes three-fifths of the expenditures made during the years 1934 to 1939, inclusive, aggregating $11,870.21. The regulations authorize [4] an apportionment of the cost or other basis of a patent over its life "since its grant" and state that if it "was acquired from the Government, its cost consists of the various Government fees, cost of drawings, experimental models, attorneys' fees, development or experimental expenses, etc., actually paid." Some of petitioner's witnesses indicated that they thought, and counsel seems to have the same view, that "development and experimental expenses" include all sums paid or incurred in utilizing the patent, regardless of the period of time that may have elapsed since its issuance or of the number of models, devices or processes in which it had been tried. We do not so interpret the regulation. Amounts expended following the issuance of patents may be capital expenditures and constitute part of the cost of a model; [5] but generally they may *386 not be treated as part of the cost of the patents granted earlier. Of course "in the case of a group of patents consisting of a principal patent and of a number of others supplementary thereto, a depreciation allowance may be made over the life of the principal patent. Hazeltine Corporation v. Commissioner, supra; Individual Towel & Cabinet Service, 5 B.T.A. 158; Hyatt Roller Bearing Co. v. United States, 70 Ct. Cl. 443, 43 Fed. (2d) 1008; The John Douglas Co., 23 B.T.A. 1308. But since no effort was made in the present case to show which was the principal patent or patents issued in connection with any of the models this rule cannot be applied. *387 Upon brief petitioner states - "on this issue we are starting afresh to determine the proper year of additions and deductions. Petitioners seek no duplication of deductions and will consent to a redetermination of the tax years prior to 1934." While we recognize that in determining the cost or other basis of an asset we may appropriately inquire into the facts even though the year is not open, we are specifically precluded from determining "whether or not the tax for any other taxable year has been overpaid or underpaid." (Sec. 272 (g), I.R.C.) Assuming, though not deciding, that the Commissioner, as suggested by petitioner upon brief, may not be barred by the statute ( Sec. 275, I.R.C.) from proceeding against it for additional tax for the earlier years, we are powerless to make any adjustment in tax for those years in this proceeding. Petitioner's consent is therefore nugatory. Cf. Duesenberg, Inc. v. Commissioner, 84 Fed. (2d) 921. Moreover, it has been found as a fact that the cost of the patents granted prior to the taxable years was not in excess of $263,730.23. Under either view which may be taken of the action of *388 the revenue agent in connection with the claims for refund, at least that amount was allowed during the earlier years. Pattern for decision of the very difficult question begins to emerge. In our judgment none of the expenditures made during years prior to the taxable period may now be considered in determining the amortization to be allowed as cost of patents. In that view we may pass without discussion petitioner's failure to show how much of the expenditures made in the earlier period represented patent costs and how much was ordinary and necessary business expenses or expense of developing models. We may also refrain from considering or discussing respondent's charge, made in his amended answer, that petitioners are estopped from claiming any deductions in the taxable years for amortization of the expenditures made in the earlier years. We come, then, to the expenditures made during the taxable years, i.e. Salaries of Supervising Engineers
$237,966.81
Salaries of Officers and Employees
64,209.25
Other Expenditures
322,762.21
$624,938.27
It has been found as a fact that $265,000 of these expenditures represented patent costs and that the remainder, or *389 $359,938.27 constituted ordinary and necessary business expenses. Apparently petitioners have abandoned their charge that the respondent erred in disallowing the several claims for amortization of deferred engineering expenses. Manifestly he was right in doing so. Complete rationalization of our conclusion is not required. We have considered all of the arguments made by the parties upon brief, have carefully examined all of the lengthy exhibits, weighed the evidence, and chosen "from among conflicting factual inferences and conclusions those which * * * [we] consider most reasonable." Commissioner v. Scottish American Inv. Co. Ltd., et al., 323 U.S. 119, (December 4, 1944). Whether we have "borne heavily" against the taxpayer, "whose inexactitude is of * * * [its] own making" ( Cohan v. Commissioner, 39 Fed. (2d) 540) probably depends upon the point of view - petitioner may feel that we have borne exceedingly heavy against it while respondent will probably think otherwise. "In matters so practical as the administration of tax laws and in the decision of problems connected with them, a high degree of precision is often impossible to achieve." Helvering v. Safe Deposit & Trust Co., 316 U.S. 56. *390 Petitioner has been quite inconsistent in its treatment of development costs. During one portion of its existence it apparently charged all of them to expense. When it seemed to be expedient to do so it set them up as a deferred item and claimed amortization on a "model" basis. Later its board of directors formally resolved to charge them off as ordinary and necessary business expenses. In filing its return for the taxable years it claimed under both methods, deducting approximately $300,000 as amortization and $1,000,000 as expense. Confronted with the fact that the present taxable period becomes its base period for the computation of its excess profits tax liability in future years ( Sec. 710 et seq. I.R.C.) and apparently realizing that it will be in a better position if such expenditures are properly treated, it attempts to make the retroactive adjustment. While we have held that may not be done as to the years which are not before us, its tax liability should be computed correctly for the taxable years. But while petitioner has been inconsistent and, to some extent, must suffer the consequences, respondent's position is far from tenable. Usually he has *391 espoused the view, which has consistently been sustained, that expenditures of a capital nature may not be deducted as ordinary and necessary business expenses but must be capitalized. See e.g. Claude Neon Lights, Inc., 35 B.T.A. 424, and Hazeltine Corporation v. Commissioner, supra.In the instant case, however, he has taken the position that no part of the amounts paid to Wescott, Hubbard, Osborn and the supervising engineers or of the amounts expended in the development of models constituted patent costs, notwithstanding the fact that 155 patents were granted. He therefore insists that the deductions of those amounts as ordinary and necessary business expenses be not disturbed. Can it be that he, too, is conscious of the impingement of decision in the instant case upon future tax years? The question need not be answered. We refer to it only for the purpose of stressing the importance, both to the fiscus and to the taxpayer, of finding the right answer to the difficult problem. Clearly it lies somewhere between the two extremes. In lieu of the amounts determined by the respondent to be capital expenditures, as set out in our findings, we hold that the *392 aggregate amount determined by us to be patent costs ($265,000) shall be allocated among the several petitioners as follows: A-Del
M-Del
S-Del
A-MC
Total
1934
$19,000.00
$7,100.00
$600.00
$ 800.00
$ 27,500.00
1935
18,500.00
7,000.00
500.00
1,000.00
27,000.00
1936
14,000.00
5,000.00
500.00
21,000.00
40,500.00
1937
600.00
44,900.00
45,500.00
1938
62,500.00
62,500.00
1939
62,000.00
62,000.00
Total
$265,000.00
The amounts heretofore claimed and allowed as ordinary and necessary business expenses shall be proportionately reduced. Issue III Did the respondent err in disallowing deductions claimed during the years 1934 to 1937, inclusive, as amortization of moving expenditures? Findings of Fact Prior to 1932 A-MC, A-Del and M-Del decided to consolidate all manufacturing operations into a modern, single-floor plant, with railroad sidings, and to have A-Del and M-Del become selling outlets. A-MC purchased vacant acreage at Euclid, Ohio, and erected its present building thereon. The plant and equipment of A-Del was moved from Chicago, the plant and equipment of M-Del was moved from Cleveland *393 and the plant and equipment of Set-O-Type Company was moved from Dayton in 1931 and 1932, all to the new plant at Euclid, Ohio, which is a suburb of Cleveland. Many of the better trained employees and personnel of A-Del were also moved at the expense of the employer from Chicago to Cleveland. On the books and records of A-Del the following expenditures, aggregating $158,752.50, were shown: 1931
1932
Total
Clean and Paint all machines in all
departments before shipping
to Cleveland
$ 6,244.35
$ 571.60
$ 6,815.95
Replace fractional H.P. motors on
portable tools and machines
with 110 volt 60 cycle single phase
motors for new Cleveland
plant
81.08
347.49
428.57
Installation planning dept. data for new
Cleveland factory pro-
duction system
12,370.90
8,244.97
20,615.87
Checking and correcting blueprints
before sending them to
Cleveland
174.35
535.86
710.21
Dismantling equipment, purchasing lumber
and skidding for
moving to Cleveland
621.08
3,838.35
4,459.43
Inspecting productive material in stock
before shipping to Cleve-
land
$ 7.65
$ 231.35
$ 239.00
Moving machines and plant equipment to
44.90
11,115.28
11,160.18
Cleveland
Moving furniture to Cleveland
56.29
256.76
313.05
Planning layout for new Cleveland
1,086.50
23.30
1,109.80
factory
Material and labor for overhauling
machines and equipment be-
fore shipping to Cleveland
1,478.84
6,823.99
8,302.83
Material and labor in making
Addressograph plate records of
routings and material lists on
Addressograph products to be
manufactured at the new plant
2,226.44
4,744.56
6,971.00
Material and labor in making
Addressograph plate records of
routings and material lists on
Multigraph products to be
manufactured at the new plant
368.68
263.73
632.41
Installation Multigraph planning dept.
data for new factory pro-
duction system
156.18
538.08
694.26
Moving employees to Cleveland
18,819.53
33,658.33
52,477.86
Moving finished stores, dies, jigs,
fixtures, patterns, etc., to
Cleveland
39,936.31
39,936.31
Locating, checking, etc., all tools,
jigs, fixtures, gauges, etc., in
connection with moving to Cleveland
3,885.77
3,885.77
$158,752.50
*394 On the books and records of M-Del the following expenditures, aggregating $51,871.29, were shown: 1931
1932
Total
Cleaning and painting machinery
$ 3,566.40
$ 779.58
$ 4,345.98
Overhauling machinery
453.00
842.30
1,295.30
Dismantling and skidding machinery
.96
670.60
671.56
Dismantling line shafting at E. 40th St.
75.03
75.03
plant
Planning layout of departments in new
324.88
1,339.58
1,664.46
plant
Sort, index, tag and renumber tools for
2,516.36
942.24
3,458.60
new system at new plant
Sort and pack stock for moving to new
13.98
1,274.08
1,288.06
plant
Arrange materials in stock rooms at new
79.66
6,856.31
6,935.97
plant
Installing production, scheduling and
planning data for manu-
facture at new plant
2,195.27
3,357.54
5,552.81
Labor and supplies at new plant on
102.93
440.15
543.08
installation of machinery
Labor and materials for line shafting at
101.81
1,474.54
1,576.35
new plant
Installation and layout of piping and
general plumbing at new
plant
17.25
408.55
425.80
Salvage old shop benches and make new
1,249.15
1,249.15
benches for new plant
Trucking expense - to and from old and
2,512.00
2,512.00
new plant
Erecting machinery at new plant
4,751.54
4,751.54
Moving and remodeling cottage on
470.46
470.46
property on Babbitt Road
Arrange tools in tool crib at new plan
2,750.97
2,750.97
Crate tools at E. 40th Street plant for
325.20
325.20
moving to new plant
Material and labor for painting all
steel for line shafting and
countershaft supports at new plant
329.19
329.19
Testing light fixtures at E. 40th St.
before installing in office
departments at new plant
18.45
18.45
Dismantling shelving and partitions at
45.39
45.39
E. 40th St. plant
Tearing down restaurant wall at new
plant for installing steel
partitions for Time Department
80.75
80.75
Erecting equipment in Plating Department
117.90
117.90
Cleaning Printing Dept. materials, and
sorting and packing in
preparation for moving to new plant
52.30
52.30
Cleaning machines and equipment at new
plant received from
Chicago
532.42
532.42
Unloading machines and materials at new
plant received from
Chicago
822.60
822.60
Rehabilitate E. 40th Street plant
1,440.26
1,440.26
Layout of floor space for Drylith
372.08
372.08
Department at East 40th Street
Move Model No. 69 Machines at E. 40th
Street from basement
to 2nd floor
49.10
49.10
Make steel rods for plating tanks at new
6.76
6.76
plant
Electrical construction work for
machines and equipment at
new plant
1,812.21
1,812.21
Repairing machinery received at new
185.50
185.50
plant from Chicago
One day's pay allowance for Chicago
employees in locating resi-
dence in Cleveland
1,360.55
1,360.55
Tearing out concrete floor in restaurant
in new plant for drain
and water lines
406.09
406.09
Erect partition on 6th floor - E. 40th
$ 94.07
$ 94.07
Street Building
Salvage and put in shape materials
received in poor condition
from Chicago plant
103.71
103.71
Cost of moving Chicago sales agency
25.03
25.03
Move cafeteria from E. 40th Street to
new plant and refinish
equipment
153.65
153.65
Cost of moving Set-O-Type Company
2,333.40
2,333.40
machinery and equipment
Cost of installing Set-O-Type machinery
from Dayton in new
plant
512.50
512.50
Build partitions in Experimental Dept.
37.98
37.98
at new plant
Six special trucks with rubber tires for
Drylith Dept. at E.
40th Street
33.36
33.36
Refinish all office furniture
39.57
39.57
Move type for Intertype Casting Dept.
19.04
19.04
Trucking cabinets to E. 40th Street
132.18
132.18
Repair work
.68
.68
Machine up 400 pieces of angle iron for
assembling stands for
new plant
$ 18.48
110.14
128.62
Move Plate Composing Dept. from McBride
Bldg., to E. 40th
Street
93.69
93.69
Miscellaneous expenses not now
348.02
348.02
identifiable
Printing Dept. jobs applicable to moving
207.92
207.92
New chair casters for office furniture
84.00
84.00
at new plant
$ 51,871.29
*395 On the books and records of A-MC the following expenditures, aggregating $183,430 were shown: 1931
1932
Total
Moving Set-O-Type Co. plant equipment from
Dayton, Ohio to
Euclid, Ohio
$ 7,849.99
$ 7,849.99
Moving equipment from old Chicago plant to
Chicago sales
agency
708.71
708.71
Traveling expense of manufacturing
executives and plant engi-
neers between Chicago and Cleveland prior
to completion of
the new plant
1,496.04
39.85
1,535.89
Freight on office furniture and fixtures
moved from Chicago to
Cleveland
696.53
696.53
Freight on new stock room shelving
purchased from Lyon
Metal Products Co.
144.07
144.07
Freight on machinery moved from Chicago to
7,941.92
7,941.92
Cleveland
Wages for moving, trucking, etc.
952.96
952.96
Materials for cleaning and painting
102.35
102.35
machinery at E. 40th Street
Lumber and equipment for moving machinery
189.12
189.12
from E. 40th Street
Electric hammer outfit purchased
303.45
303.45
Trucking machinery from E. 40th Street to
3,810.00
3,810.00
Euclid
Dismantling and re-erecting enameling
448.50
448.50
ovens
Expenditures incurred as a result of "New
Plant Dedication
Sales Contest," in which it was agreed
that sales representa-
tives selling 100% of their quota for the
last 6 months of
1931 would be awarded a trip to Cleveland
to attend the dedi-
cation convention to be held during 1932.
Although liability
was incurred in 1931 it was not recorded
in the books of
account. -
Railroad fares, hotel accommodations and
traveling ex-
penses of sales representatives
6,227.04
6,227.04
Entertainment, awards, invitations and
4,452.08
4,452.08
publicity
Various other expenditures in connection
7,817.47
7,817.47
therewith
Interest at 5% accrued on average balance
of $175,570.83
on bank loans employed during 1932 to
finance mov-
ing operations
8,788.54
8,778.54
Salaries of factory department heads for
time devoted
to moving operations
12,527.10
12,527.10
Factory overhead attributable to moving
86,079.68
86,079.68
operations
Scrapped inventory attributable to moving
32,864.60
32,864.60
operations
Total
$183,430.00
*396 In the consolidated returns of income of A-MC and its subsidiaries for the years 1931 and 1932 deductions designated "Proportion of Moving Expenses Written Off" in the respective amounts of $39,855.45 and $79,710.99 were claimed, no portion being allocated to any particular corporation. The revenue agent, in connection with his examination of the several returns of the petitioners as hereinabove set out (see Findings or Issue II and Opinion under sub-heading Miscellaneous Patents) recommended that no change in tax liability for the years 1931, 1932 or 1933 be made, pointing out that "the year 1931 results in an overassessment and no claim [for refund] has apparently been filed" while the other two years resulted in losses. He conceded, however, that the expenditures shown above were ordinary and necessary business expenses in the years incurred. The amounts and details shown in the schedules are taken from an exhibit prepared by petitioners' comptroller at the time the revenue agent was giving consideration to their claims that they were entitled to amortize the moving expenses over a five year period beginning July 1, 1932, and ending June 30, 1937. While the moving expenditures, *397 in the proportions shown, had originally been entered on the books of A-Del, M-Del and A-MC, they apparently had been paid by A-MC. On April 30, 1932, as of January 1, 1932, intercompany journal entries were made, transferring the assets and liabilities, using the figures which appeared on the books of the subsidiaries. On December 31, 1932, the aggregate amount expended by the three companies in 1931 and 1932 in connection with the move was charged to surplus on the books of account of A-MC. Patents, trade marks, trade names and manufacturing equipment were transferred on April 30, 1932, by similar entries. Since 1932 A-MC has done all of the manufacturing of products. A-Del and M-Del were selling agencies until their dissolution in 1936. In the returns of the several petitioners for the years 1934, 1935, 1936, and 1937 the amounts shown in the schedule below were deducted from gross income under the heading "Amortization of Moving Expenses." All of the claimed deductions were disallowed by the Commissioner. In the returns of A-MC for 1938 and 1939 depreciation was claimed [7] in the respective amounts of $360,556.90 and $341,189.20. The amounts were determined by the Commissioner *398 to be excessive to the extent of $97,158 and $81,597.96. In the petition filed by A-MC it is alleged that "amortization of expenditures in moving and establishing new plant at new location, previously capitalized," should be allowed in the respective amounts of $56,260.09 and $49,227.58. The claimed amortization is therefore as follows: Addressograph-Multigraph Corp.
Addressograph
Multigraphcorp
Co.
Year
Docket 108181
Docket 111395
Docket 108182
Docket 108183
1934
$ 3,773.06
$57,636.67
$16,683.53
1935
3,773.06
57,636.67
16,683.53
1936
40,933.17
28,818.33
8,341.76
1937
39,046.84
1938
$56,260.00
1939
49,227.58
Opinion The aggregate amount claimed by the several petitioners ($378,814.29) cannot be correlated with the exhibits or the evidence. It will be noted that petitioners claimed and were allowed $39,855.45 in 1931 and $79,710.99 in 1932, an aggregate amount of $119,566.44 If this amount is added to the $378,814.29 it appears that petitioners are seeking deductions for amortization of moving expenses amounting *399 to $498,380.73. The total amount expended, however, as shown in the schedules in our findings, was not in excess of $394,053.79. [8] Of this amount the expenditures shown in the third schedule in connection with dedication of the new plant Railroad fares, etc.
$ 6,227.04
Entertainment, etc.
4,452.08
Other expenditures
7,817.47
Total
$18,496.59 were specifically conceded by petitioners not to be capital or amorizable. The most that may be allowed under any theory is therefore $375,557.20. This may be allowed only if we ignore altogether the $119,566.44, claimed and allowed in 1931 and 1932. Manifestly that may not be done. But we need not pause to attempt to reconcile all of the amounts. In each of the petitions it is alleged that the Commissioner erred in disallowing amortization of the moving expenditures in the taxable years. It is averred that the move gave the named petitioner "the benefit of bettering of operating conditions, effecting substantial savings in cost of production and general overhead, elimination of substantial trucking expenses * * * a single most modern plant with *400 manufacturing all on the ground floor, with railroad sidings and with adequate acreage for expansion as compared with several multiple floor plants in old buildings without railroad sidings * * *"; that the years benefited were those which followed the beginning of production at the new plant; and that the Commissioner erred in treating the expenditures as ordinary and necessary expenses for the years 1931 and 1932. These allegations are denied in the answers. The parties have stipulated that in 1932 * * * A-MC took from A-Del in Chicago and M-Del in Cleveland, their patents, trade marks, and trade names as well as manufacturing equipment which was moved to, and installed in the new building of A-MC, at Euclid, Ohio, during the latter part of 1931 and the beginning of 1932. These transactions were reflected by intercompany journal entries made on April 30, 1932, as of Jnuary 1, 1932, which transferred plant assets from subsidiaries to the parent, using the figures which appear on the books of the subsidiaries. The entries on the books of each of the companies reads in part: "To transfer the foregoing assets and liabilities." Petitioners' statement of Points is as follows: *401 A. The transfer of the manufacturing assets by A-Del and M-Del to A-MC in 1932 was a sale by the subsidiaries to the parent. B. The payment of the moving expenditures by A-MC to persons other than the subsidiaries A-Del and M-Del was additional cost to the purchaser A-MC. C. The expenditures as a unit added capital value to the assets of A-MC for the following reasons: 1. They effected the income of more than one year in a substantial manner, and still do. 2. They increased the value of the property in respect to which they were made. 3. They effected more than a restoration of the assets to ordinary efficient operation. 4. They increased the life of the property appreciably. 5. They increased normal output. 6. They decreased cost of operations. D. Some of the expenditures, aggregating $133,951.85, are by their nature capitalizable, irrespective of the move. A and B may be considered together. No evidence of a sale by the subsidiaries to their parent was adduced. Petitioners must therefore rely - as they do - upon the stipulation, which merely states that A-MC "took" the assets from their subsidiaries in 1932. No corporate minutes were produced to show how the *402 "taking" was brought about. Moreover apparently when that was done, i.e. in April 1932 as of January 1, 1932, the assets had already been moved to Euclid; for they had been moved "during the latter part of 1931 and the beginning of 1932." But there are other facts and circumstances which make it seem quite doubtful that a "sale" of the assets was ever made to A-MC or, if so, that it antedated the payment of the moving costs so that B could be applied. The posting of all of the expenditures in the books of the subsidiaries is significant. Add to this the circumstance that the subsidiaries are now claiming, as they did in their returns, that they are entitled to amortization during the years 1934, 1935 and half of 1936 in the aggregate amount of $185,800.49 and the claim that A-MC is entitled to amortize the whole amount under the theory implicit in A and B approaches absurdity. Counsel for petitioner indicates an awareness of that when he undertakes to argue the question from two approaches - one that the cost was paid by A-MC and the other that the cost was paid by the subsidiaries without reimbursement by A-MC. We have previously stated that the facts are found to be as stipulated *403 by the parties. We accept the facts set out above. We decline, however, to hold that a sale was made by the subsidiaries to their parent prior to the payment of the moving expenses or that the moving expenses, under the circumstances shown, "were additional cost to * * * A-MC." Much of the argument of the parties therefore falls. In this view it is unnecessary to discuss respondent's contention that, even if a sale were made, the basis could not be affected because of the applicability of Art. 38 (b) of Regulations 75 and 78, the sale being one between corporations during a consolidated return period. It is also unnecessary to point out the inconsistencies in the argument of petitioners' counsel, resulting from attempting to espouse two conflicting views. Coming now to Point C, petitioners are confronted by an array of cases applying the rule that "the expense of physically moving the machinery from one building to * * * [another is] not an installation cost or improvement made but rather a business expense of moving from one location to another." MacAdam & Foster, Inc., 8 B.T.A. 967; Eastern Shoe Mfg. Co., 8 B.T.A. 1169; L. A. Thompson Scenic Railway Co., 9 B.T.A. 1203; *404 Fowler & Union Horse Nail Co., Inc., 16 B.T.A. 1071; Parkersburg Iron & Steel Co., 17 B.T.A. 74, affirmed 48 Fed. (2d) 163; Alexander Sprunt & Son, Inc., 24 B.T.A. 599, affirmed (on this issue) 64 Fed. (2d) 424. Petitioners suggest that the force of these decisions has been somewhat weakened by cases holding that the expense of moving a building from one lot to another represents a capital expenditure; but we are not impressed with their argument. In the view which we take, much of the evidence tending to show that the moves decreased the cost of operations, increased output and affected the income of more than one year is immaterial. An attempt was made to show that the savings effectuated amounted to more than $100,000 per annum. The evidence has been considered; and, while we are satisfied that some saving in operating costs did result, we hesitate to venture a guess as to the amount thereof or to accept the obvious speculation of the witnesses, especially since it cannot affect our decision. On the authority of the cited cases it is held that the amounts expended in moving the plants and equipment to the new location *405 and the amounts paid in connection with the removal of the personnel from Chicago to Cleveland were not capital expenditures. It follows that most of the claimed deductions for amortization were properly disallowed. Petitioners' alternative claim that some of the amounts "are by their nature capitalizable, irrespective of the move", has more substance. In this category it lists practically all of the items appearing in the first schedule shown in our findings except moving employees ($52,477.86) and moving stores, dies, jigs, etc. ($39,936.31); practically all of the items appearing in the second schedule; and most of the items appearing in the first half of the third schedule. Considerable evidence was adduced at the trial pertaining to the installation of a new planning and production system, shown in the first schedule as $20,615.87 and $6,971 and in the second as $1,664.46 and $5,552.81. We are satisfied from the evidence that these expenditures were of a capital nature. Whether any amortization may be allowed is another question. The record does not indicate the probable useful life of the "system". To the extent that it resulted in property having a limited life - e.g. the *406 $6,971 item which seems to have been expended primarily in the making of addressograph plates - it is reasonable to conclude that amortization should be allowed. For present purposes we classify the plates as "Factory Furniture and fixtures", conclude that they had a cost of $6,971, and hold that this portion of the aggregate amount ($34,804.14) may be amortized at the rate the parties have agreed for "Factory Furniture and Fixtures." The remainder ($27,833.14) may be capitalized; but no amortization can be allowed upon this record. Most of the other expenditures shown in the schedules, were, in our judgment, properly held by the Commissioner to be ordinary and necessary business expenses. The following, however, represented the cost of new assets, should be included in capital account, and must be amortized, not over a five year period as claimed by petitioners but over their useful life. In other words, they shall be classified as "Machinery", "Factory Furniture & Fixtures", 'Permanent Tools", "Office Furniture and Fixtures" or placed in some other proper account and be depreciated at the rate agreed upon by the parties. Motors on Portable Tools
$ 428.57
Overhauling Machines
8,302.83
Overhauling Machines
1,295.30
Line Shafting new plant
1,576.35
Piping and plumbing new plant
425.80
New shop benches
1,249.15
Installing steel partitions
80.75
Steel rods for plating tanks
6.76
Electrical construction
1,812.21
Drain and water line construction
406.09
Partitions in experimental Dept.
37.98
Six special trucks
33.36
Angle iron for stands
128.62
New Chair Casters Office Furniture
84.00
Freight on new shelving
144.07
Electric Hammer purchased
303.45
*407 The last item shown in the third schedule, "Scrapped inventory attributable to moving operations $32,864.60," appears to represent an appropriate adjustment to inventory rather than an ordinary and necessary business expense. However, since no issue is raised other than whether it may be capitalized and amortized, we pass it without further discussion, having held that it may not be capitalized on the present record. Issue IV Did the respondent err in refusing to allow (a) the deduction claimed by A-MC for "guaranteed dividends", paid to minority stockholders of The Set-O-Type Manufacturing Company in the amount of $22,500 in 1934 and $30,000 in 1935? and (b), similar deductions by A-Del for "guaranteed dividends" paid by it to the minority stockholders of a subsidiary, Speedaumat Manufacturing Company, in the amount of $7,928.88 in 1934 and $4,659.29 in 1935? Findings of Fact On April 11, 1932, a contract was executed by A-MC and its subsidiary, Set-O-Type Co., an Ohio corporation, which provided, among other things, that certain litigation had arisen concerning a contract between the Set-O-Type Co. and the American Multigraph Co., dated June 1, 1929, providing for the *408 sale by the Multigraph Co. of set-o-types and other products manufactured by Set-O-Type Company, and that the parties were desirous of terminating said litigation. It was agreed that the Set-O-Type Co. should organize, at the expense of A-MC, a new corporation having class A and class B stock. The class A stock was to be given dividend preference over the class B, which latter was to be common, having no-par value. It was agreed that the class A shares should be entitled, out of any dividends declared in any calendar year, to a dividend equal to $2 per share per annum, before any dividends should be declared or payable upon the common shares. A-MC agreed that if the dividends upon the class A stock payable July 1, 1934, or any dividend payable thereafter up to and including April 1, 1941, should not be paid on the first day of July, October, January, or April of each year, it would forthwith pay the dividends due and unpaid to the holders of the class A stock. Any amount so paid by A-MC was to be made a charge upon the net earnings of the new corporation. If, by July 1, 1941, the amounts "* * * so advanced" exceeded the amount of the dividends received by A-MC on class B stock up to *409 that date, then it was provided that no dividends should thereafter be declared or paid upon either class A or class B stock until such excess had been paid out of earnings or surplus. In consideration of the foregoing agreements, the Set-O-Type Co. agreed to sell and transfer its assets, totalling approximately $500,000, to A-MC for which it was to receive 15,000 shares of class A stock, fully paid and nonassessable. The actual agreement of guaranty on the certificates of the class A stock of the new corporation, known as The Set-O-Type Manufacturing Co., provided for the payment of guaranteed dividends as set forth above and in addition stated that A-MC was "* * * to be reimbursed on or after July 1, 1941, out of any surplus or net profits of the company for the total amount so paid, without interest, after deducting therefrom an amount equal to all dividends paid on the class B shares during the period for which the undersigned has so guaranteed dividends upon class A shares; all amounts to which the undersigned is entitled to reimbursement hereunder to be and become on July 1, 1941, a charge upon and payable out of [The Set-O-Type Manufacturing] Company's surplus and/or net profits *410 then or thereafter available for dividends * * *." The class A stock to which the guarantee applied was retired from time to time as follows: Nov. 30, 1936
14,500 shares
Apr. 30, 1937
58 shares
June 4, 1937
14 shares
Nov. 30, 1937
28 shares
Oct. 27, 1937
400 shares
Total
15,000 shares
During the years 1934 and 1935, A-MC made payments under the contract in the amounts of $22,500 and $30,000, respectively. On its books, the payments were charged to expense in the year paid. The amounts were deducted in its income tax returns. The Commissioner disallowed the claimed deductions. Under date of November 27, 1928, an agreement was entered into between Speedaumat Addressing Machinery, Incorporated, (hereinafter sometimes called Speedaumat) and A-Del wherein, after stating that A-Del desired to acquire an interest in the business of Speedaumat, the parties agreed that a new corporation should be organized and that Speedaumat should transfer to it all of its assets and business, with certain reservations, in return for receiving a specified number of class A shares of stock. Article 7 of the agreement states that "in consideration of the agreements and undertakings *411 of the party of the first part * * *, the party of the second part (A-Del) hereby covenants and agrees on its behalf, as follows, to wit: * * *." A number of provisions then follow giving class A stock preference as to dividends over the class B stock up to $3.50 per share per annum, payable quarterly, and giving the class A stock the right to elect two of the seven members of the board of directors. In all other respects the class A and class B stock had equal voting powers. All of the class B stock was to be held by A-Del. In Article 16, A-Del agreed to guarantee the payment of dividends of $3.50 per share per annum on the class A stock to be acquired by Speedaumat in the "New Corporation", as long as any of the class A stock should remain outstanding. A more formal agreement, dated December 24, 1928, was executed by Speedaumat, A-Del and the new Speedaumat Manufacturing Company, which carried out the arrangement provided for in the earlier agreement and contained an explicit and unconditional guarantee of the payment of $3.50 per share per annum dividends on the 6,000 shares of class A stock held by Speedaumat, the "old" company. The class "A" stock to which the guarantee applies *412 was retired from time to time as follows: 1929
600 shares
1930
100 shares
1931
1,390
shares
1932
700 shares
1933
396 shares
1934
816 shares
1935
897 shares
1936
869 shares
1937
232 shares
Total
6,000
shares
During the years 1934 and 1935, A-Del paid the respective amounts of $7,928.88 and $4,639.59 under the provisions of the contracts. These amounts were charged to expense on its books. The 1934 payment was deducted on its income tax return for that year, but was disallowed by the respondent. Opinion Petitioners contend that the guaranteed dividend payments, made as shown in the findings, are deductible either: (1) as losses under section 23 (f) of the Revenue Act of 1934; or (2) as ordinary and necessary business expenses under section 23 (a); or (3) as interest payments under section 23 (b). We will first consider the payments made to the stockholders of the Set-O-Type Company. Respondent contends that they were advances or loans to that company and that no loss was deductible because of them under section 23 (f) of the 1934 Act. An examination of the agreement of April 11, 1932, and the agreement of guaranty, convinces us that this *413 contention is sound. It appears to have been the intention of the parties that any amounts paid by A-MC in connection with its guarantee, should betreated as advances or loans; that the parties should wait until July 1, 1941, before there should be any settlement; that A-MC was "to be reimbursed on or after July 1, 1941, out of any surplus or net profits of the company for the total amount so paid, without interest", after deducting therefrom an amount equal to all dividends paid on the class B shares; and that all amounts to which A-MC was entitled should become on July 1, 1941, a charge upon, and payable out of, any surplus or net profits of Set-O-Type Co. then or thereafter available for dividends. The case relied upon by petitioners - Robert S. Farrell, 44 B.T.A. 238 - is distinguishable upon its facts. There the taxpayer, having acquiesced as a director in the payment of large dividends by a corporation which had a substantial bonded indebtedness, as a result of threatened action against him, agreed with a bondholder's committee that he would supply, for distribution to the bondholders, funds necessary to meet certain future interest payments. He did so and the *414 transaction was ended, since no provision, express or implied, was made for repayment of the amount to him. The payment was held to be a loss. Under the present facts, however, A-MC was to be reimbursed. Indeed, for aught appearing in this record, it may actually have been reimbursed prior to the trial. So long as the right to reimbursement existed it cannot be said that a loss was sustained. Respondent did not err in refusing to allow the claimed deductions as losses. The deduction of the payments as ordinary and necessary expenses is likewise not permissible. In Glendenning, McLeish & Company, Inc., 24 B.T.A. 518, 523, where a similar contention was made, this tribunal said: "It is well settled * * * that, where the taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of loans or advancements and are not deductible as business expenses. George M. Cohan, 11 B.T.A. 743 affirmed on this point, 39 Fed. (2d) 540; H. R. MacMillan, 14 B.T.A. 1367Henry F. Cochrane, 23 B.T.A. 202." In support of their contention that the payments are deductible as interest *415 under section 23 (b) of the 1934 Act, petitioners on brief merely state: Lastly, under the wording of the documents, the payments may be viewed as interest payments and thus deductible under section 23 (b) of the Revenue Act of 1934. In connection with this view of the deduction, it should be noted that the stock involved was retired from time to time as provided for in the agreements. The section authorizes the deduction of "all interest paid or accrued within the taxable year on indebtedness * * *." Just how the payments in question can be construed to be within this section is not suggested. It is obvious they were not interest. The deductions claimed may not be allowed on any of the suggested theories. It follows respondent committed no error in disallowing them. The petition filed by A-Del alleges that the disallowance of the amount claimed as a deduction in 1934 was erroneous and also that it should be allowed the amount paid in 1935. The contracts requiring it to pay certain guaranteed dividends are similar to the contract between A-MC and the Set-O-Type Co., except that there is no provision for reimbursement. They clearly indicate that the guaranty agreement was made *416 in connection with the acquisition of an interest in Speedaumat's business. The question presented does not differ materially from that considered in Atlantic Coast Line R. Co. v. Commissioner (C.C.A. 4, 1936), 81 Fed. (2d) 309; cert. denied 298 U.S. 656, affirming 31 B.T.A. 730. In that case a railroad acquired the common stock of another railroad for a stated consideration and agreed to guarantee dividends on the subsidiary's preferred stock. The question was whether it was entitled to deduct from its income as "ordinary and necessary expenses" payments made in performance of this guarantee. It was contended by the taxpayer that the obvious purpose of the agreement was to place it in a position to maintain and exercise continuous control of the properties of the other railroad and to operate them as part of its system. It was pointed out that the taxpayer acquired nothing new or in addition to what it already had by making the payments, and that each payment preserved for the six months' period the existing right to exclusive voting control over the subsidiary's affairs and the management of its properties. The petitioner contended that the *417 payments were regularly recurring expenses necessary to preserve control over the physical operations of a part of its railroad system and should be regarded either as an ordinary and necessary expense of doing business or as a loss sustained in the course of its operations. The court held that the payments were part of the consideration paid for the common stock and were, therefore, capital expenditures rather than losses or ordinary and necessary business expenses. In conclusion, the Court pointed out that the basis of the stock for gain or loss in case of a sale would be determined by reference to the original cash outlay, plus the amounts paid in performance of the guarantee. Only if the stock were sold and the taxpayer forced to make additional payments under the guarantee because it continued in force even after sale, would the amounts be deductible as losses. The decision of the Court in the cited case, if not controlling, is at least very persuasive. In our judgment the payments made by A-Del to the minority stockholders of the Speedaumat Manufacturing Company are not deductible. Issue V Subdivisions A and C of this issue, as discussed by the parties upon brief, involve *418 the $125,839.15 determined by us under Issue I to be part of the cost of the assets of M-Ohio. The $100,000 paid to The First National Old Colony Corporation of Boston was claimed by A-MC as a loss deduction in 1936 and the $25,839.15 was claimed as a similar deduction by M-Del. The claimed deductions were disallowed by the respondent. While the disallowances, made the subject of charges of error in the respective petitions, have not been abandoned by petitioners, and are discussed as subdivisions of this issue, it is manifest we need give them no further consideration in view of the fact we have sustained petitioners' alternative contention. We will therefore discuss only issues B and D. (B) Should A-Del be allowed to deduct as a loss in 1936 the amount of $33,782.66 representing expenses incurred at the time of its organization? (D) Should S-Del be allowed to deduct as a loss in 1937 the amount of $3,250 representing legal expenses incurred at the time of its organization? Findings of Fact (B) A-Del was organized in 1927 and paid the total amount of $33,782.66 as organization expenses to the following: (a) F. H. Woods, Chicago, Ill. - legal
fee
$25,000.00
(b) State of Delaware, incorporation
fee
600.00
(c) Corporation Trust Co. legal & pro-
fessional services
442.84
(d) Wm. O. Belt, Chicago, Ill., legal
fees
377.00
(e) Cutting, Moore & Sidley, Chicago,
Ill., legal fees
2,205.70
(f) Woods, Woods & Aitken, Lincoln,
Neb., legal fees
3,255.70
(g) L. L. Emerson, Secretary of State
of Ill., incorporation initial fees
1,046.27
(h) Arthur Anderson & Co., Chicago,
Ill., accounting fee
600.00
(i) E. A. Aulass & Co., Chicago, Ill.,
court reporting service
251.80
(j) C. J. Hayes, miscellaneous incor-
poration expenses
3.35
$33,782.66
*419 The expenditures shown above were capitalized on the books of A-Del during 1927. On June 30, 1936, A-Del was liquidated and all of its assets and properties were distributed to A-MC which owned all of its stock. On July 9, 1936, A-Del was dissolved. The payment of $25,000 legal fee to F. H. Woods was for special legal and financial services relating directly to the organization and incorporation of A-Del, including the preparation of its articles of incorporation and corporate by-laws. The firm of Cutting, Moore and Sidley was paid $2,205.70 for reimbursement of expenses and legal fees relating to examination of corporate records and organization and examination of legality of various plans of reorganization, etc. The amount of $3,255.70 paid to Woods, Woods & Aitken was for reimbursement of expenses and fee for services rendered in connection with the incorporation of the A-Del in the State of Delaware, the transfer of assets to said company and related matters in connection therewith. In paragraph 4 (j) of the petition in Docket 108182 it is alleged that the Commissioner erroneously and improperly failed to reduce the 1936 income of the petitioner (A-Del) by organization *420 expenses of $33,782.66. (D) In November and December of 1928 Messrs. Alden, Latham & Young, Attorneys-at-law, Chicago, Illinois, performed certain legal work for Addressograph Co. (later A-Del) in connection with the organization and incorporation of S-Del. Four vouchers were issued: 11-30-28
Reimbursement of the
attorneys for pay-
ments to the Secre-
tary of State of
Illinois
(a) for Illinois license
and initial fee
$250.00
(b) advance franchise
tax
187.50
$ 437.50
12-14-28
Reimbursement stock
tax on 16,000 shares
of S-Del stock at 5(
per share
800.00
12-13-28
Reimbursement amount
paid Corporation
Trust Co.
$250.00
Cash paid to County
Recorder
1.25
251.25
12-31-28
Alden, Latham & Young
3,112.15
Total
$4,600.90
In the books of S-Del the above charges were allocated as follows: To capital stock tax
$ 800.00
To franchise tax
187.50
To legal expense
363.40
To organization expense
3,250.00
Total
$4,600.90
From 1928 to 1932 A-Del did the manufacturing and selling for S-Del. After January 1, 1932, A-Del did the selling for S-Del and A-MC did the manufacturing. The *421 manufacturing equipment of S-Del, which at all times from 1928 was in the possession of A-Del in Chicago, was shipped from Chicago to Euclid, Ohio, in 1931 and 1932 and installed in the new plant of A-MC. On December 30, 1937, S-Del was liquidated and dissolved and its assets were distributed to A-MC, the owner of all of its stock. Since the liquidation of S-Del A-MC has done the manufacturing and selling of Speedaumat products. In paragraph 4 (c) of the petition in Docket 108184 it is alleged that the Commissioner erroneously and improperly failed to reduce the 1937 income of S-Del by organization expenditures of $3,250. Opinion The parties agree that the amounts shown in the findings were expended, that the two corporations were liquidated, and that their assets and liabilities were taken over and remain the property of A-MC. The question is whether the amounts may be deducted by the liquidated corporations as losses. In cases involving the deductibility of organization expenses a distinction has always been made between instances where there has been an ordinary liquidation followed by a surrender of the corporate charter and dissolution ( Malta Temple Association, 16 B.T.A. 409) *422 and instances where there has been a statutory merger or consolidation ( Citizens Trust Co., 20 B.T.A. 392). In the former a loss deduction has been allowed on the theory that when complete liquidation and dissolution occurred a capital asset, acquired at the time of organization, was lost. In the latter no loss deduction has been allowed because the surviving or merged corporation continues to receive the benefit of the organization expenditures. Cf. Brown Fence and Wire Co., 46 B.T.A. 344; Motion Pictures Capital Corporation, 32 B.T.A. 339, affd., 80 Fed. (2d) 872. Petitioners, obviously recognizing the two rules, argue that in the instant case the subsidiaries were liquidated under the laws of Delaware dealing with pure liquidations and not under sections dealing with consolidations and mergers. Whether that is so or not, in our judgment, is immaterial. The acquisition by one corporation of all of the assets of another, followed by the dissolution of the latter, is a statutory merger or consolidation under the applicable revenue acts. A-MC, the acquiring corporation, continues to carry on the business formerly operated by its *423 two subsidiaries and continues to receive the benefit of their organization expenditures. Under these circumstances we are of the opinion and hold that the petitioners have failed to prove that their respective incomes should be reduced by the amounts now claimed. An additional reason exists for denying the claimed deduction by S-Del. The $3,250 paid to Alden, Latham & Young was apparently paid by A-Del rather than S-Del which is claiming the deduction. There is nothing in the evidence or the stipulation of the parties to indicate that S-Del ever paid the amount or reimbursed A-Del for the payments made by it. Issue VI Did the respondent err in disallowing a deduction of $17,241.49 claimed by A-MC in 1937 for legal and other expenses paid in connection with a refinancing plan? Findings of Fact In connection with a proposed refinancing A-MC incurred and paid the following expenditures during the year 1937: Date Paid
Particulars
Amount
(a) 7-14-37
Woods, Aitken & Aitken,
legal services
$ 6,000.00
(b) 6-28-37
Price, Waterhouse & Co.,
accounting services re
preparation of prospec-
tuses, etc.
6,832.56
(c) 5-25-37
The Cleveland Typeset-
ting Co., Printing pro-
spectuses
3,518.84
(d) 6- 5-37
Arthur Anderson & Co.,
fee in connection with
review of audit working
papers re prior years
400.00
(e) 6- 3-37
Wade Park Manor Corp.,
Hotel expenses of W. I.
Aitken, attorney in con-
nection with refinanc-
ing matters
100.79
(f) 6- 4-37
Brown Bros., Harriman
& Co. - Cable re foreign
subsidiaries with refer-
ence to refinancing
16.67
(g) 5-18-37
Wm. I. Aitken, attorney's
traveling expenses in
connection with refi-
nancing
106.20
(h) 5-20-37
Chicago Club, Wm. I. Ait-
ken expenses in connec-
tion with refinancing
23.95
(i) 5-20-37
Woods, Aitken & Aitken,
traveling expenses in
connection with refi-
nancing
130.29
(j) 5-24-37
Woods, Aitken & Aitken,
traveling expenses in
connection with refi-
nancing
112.19
$17,241.49
*424 These items were charged to expense on the books of A-MC in 1937, deducted on its income tax return for that year and disallowed as a deduction by the Commissioner in his deficiency notice. The parties have agreed that items (c) to (j), inclusive, are correctly described in the foregoing schedule. The services rendered by Woods, Aitken & Aitken were in connection with drafting plans for the proposed refinancing and preparation for registration with the Securities and Exchange Commission and sale to bankers of 62,800 shares of cumulative preferred stock. The services rendered by Price, Waterhouse & Co., were in connection with the preparation of a proposed registration statement, Form A-2, and for the annual report to the Securities and Exchange Commission, Form 10-K, for the year ending December 31, 1936. The fee for these services was $6,500, of which $750 related to the preparation of the annual report, Form 10-K, $332.56 was for reimbursement of out-of-pocket expenses for traveling, cablegrams, etc. On September 29, 1937, a special stockholders meeting was held to vote on a plan to authorize the issuance of 100,000 shares cumulative convertible $50 par preferred stock. *425 The following excerpt from the minutes shows the result of the meeting: "The Chairman then addressed the stockholders and stated that in the opinion of the management it was inadvisable to proceed with the contemplated financing in view of the unsettled nature of the financial markets and also because of the improvement in the company's business. The matter had been thoroughly considered by the officers and directors and it was their recommendation that the matter be indefinitely postponed. "Whereupon, after a general discussion, on motion duly made, seconded and unanimously carried by vote of all of the stockholders present in person and represented by proxy, it was "RESOLVED, that the plan heretofore submitted to the stockholders for the amendment of the Certificate of Incorporation to provide for the issuance and sale of Cumulative Preferred Stock be indefinitely postponed, and "FURTHER RESOLVED, that this adjourned special meeting of stockholders be, and it is hereby, adjourned sine die." The meeting was thereupon adjourned as aforesaid. Since the indefinite postponement of the plan for the issuance and sale of cumulative preferred stock it has not again been considered. *426 Opinion Petitioner seeks to deduct the amount of $17,241.49 either as an ordinary and necessary business expense or as a loss. In Doernbecher Mfg. Co., 30 B.T.A. 973, the taxpayer, in 1929, had paid the sum of $9,902.58 as its share of the expenses of investigating the possibility of a proposed merger of furniture concerns, which had not eventuated. We said: "As far as petitioner was concerned the proposed merger in connection with which it incurred expenses was abandoned in 1929 and it is entitled to the deduction claimed." In the instant case respondent places considerable reliance upon the statement in the resolution that the plan had been "indefinitely postponed". He has suggested that this indicates the proposed reorganization had not been abandoned and therefore that the rule enunciated in several cases to the effect that expenditures in connection with a reorganization are not deductible as ordinary and necessary business expense but merely diminish the net return for the stock, should be applied. Cf. James I. Van Keuren, 28 B.T.A. 480, and Barbour Coal Co. v. Commissioner, 74 Fed. (2d) 163. The services were rendered at least *427 7 years prior to the hearing. No reorganization has taken place. The resolution states that in the opinion of the management "it was inadvisable to proceed with the contemplated financing in view of the unsettled nature of the financial markets and also because of the improvement in the company's business." Under the circumstances we think we are justified in concluding that the reorganization had been abandoned. In that view and on the authority of Doernbecher Mfg. Co., supra, the claimed deduction is allowed. Issue VII Did the Commissioner err in refusing to allow deductions of $38,000 in 1938 and $2,000 in 1939 representing additions or credits to the reserve for Hundred Club? In the alternative, did he err in failing to reduce income in 1938 by charges made by petitioner to the reserve for Hundred Club? Findings of Fact Since 1934, A-MC has maintained a "Hundred Club", the purpose of which is to stimulate interest in sales by rewarding agents and salesmen who make one hundred percent or more of the annual sales quota assigned to them. A-MC and its predecessor companies, A-Del and M-Del, have followed this practice and custom of rewarding successful salesmen *428 for more than 25 years. At the time of employment each sales agent and salesman is told that if he is successful in selling a specified quota or exceeding it he will be eligible to membership in the Hundred Club; but no specific additional compensation is promised. A-MC has generally rewarded members of this club by giving them a vacation, all of the expenses of which are paid by the corporation, and by giving cash prizes to those men having the highest record of sales. On its books A-MC has a reserve account entitled "Reserve for Hundred Club". Each year this account is credited with the estimated cost of prizes and entertainment to be given members of the club during the early part of the following year, and the account is charged with actual expenditures made. A summary of the charges and credits to the "Reserve for Hundred Club Account" for the years 1934 to 1939, inclusive, is as follows: Credits to Reserve
Actual
Expenditures
Credit Balance
Calendar
Charged to
in Reserve at
Year
Reserve
A-Del
M-Del
A-MC
December 31st
1934
$ 4.89
$ 3,602.89
$ 3,602.00
$ 7,200.00
1935
10,151.27
10,224.90
7,226.37
14,500.00
1936
25,032.60
7,500.00
7,500.00
$ 17,300.99
21,768.39
1937
33,166.35
42,000.00
30,602.04
1938
34,240.53
41,638.49
38,000.00
1939
40,050.73
42,050.73
40,000.00
$142,646.37
$21,327.79
$18,328.37
$142,990.21
$40,000.00
*429 A-MC keeps its books and files its returns on an accrual basis. In the notice of deficiency for the year 1938 the Commissioner held: "addition to reserve for 1939 Hundred Club in the amount of $38,000 has been disallowed as not constituting a proper deduction for the year 1938 under the provisions of Section 23 (a) (1) of the Revenue Act of 1938." In the notice of deficiency for 1939 he disallowed "Reserve for 1940 Hundred Club $40,000" but allowed the deduction of $38,000 for the 1939 Hundred Club, saying: "The amount of $38,000 charged on your books to a reserve account representing additional sales expenses, has been allowed as a deduction." Opinion A-MC contends that it is entitled to deduct the amounts credited annually to the reserve account while the respondent urges that a deduction is allowable only for the amounts charged to the reserve account each year, representing the amounts actually expended. Petitioner cites and relies upon Willoughby Camera Stores, Inc. v. Commissioner, 125 Fed. (2d) 607 (rev'g. 44 B.T.A. 520). In that case the question was whether a corporation was entitled to deduct, as business expenses, amounts which it set *430 up on its books as reserves for employees' bonuses. The amounts were deducted by the corporation on the accrual basis in 1935 and 1936, although not paid until the following years. The president of the corporation testified that, at the time of hiring, the employees "are told that we run a cooperative organization, that they are co-partners in the business, and after two year's service they participate in a general bonus distribution." In December of each year the board of directors met to determine how much should be paid as bonuses during the next year. Following this determination a memorandum was handed to the treasurer, who credited the amount to the "Reserve for Bonus or Extra Compensation" and charged it to profit and loss. The Circuit Court of Appeals for the Second Circuit stated that the action of the board of directors must be regarded, in view of the corporation's custom, as definitely fixing a minimum for the amount to be paid; that the amount was known to the employees and the action of the directors was intended by the company and accepted by the employees as more than a statement that so much would be paid if the company did not change its mind; and that where promise *431 of bonus is held out to an employee at the time of hiring, and similar hopes have been stimulated in fellow employees, there is an implied obligation to make payment and the employee may sue for his bonus, though his recovery may be limited to a nominal amount. "Since there was an obligation enforceable within the taxable year", the court held the deductions to be proper. In the course of its opinion the court said: "No doubt the obligation imposed on the employer by such a contract, while the amount remains both unknown and unknowable, will not serve as the basis of a deductible accrual." The quoted statement distinguishes the Willoughby case from the instant proceeding. While it might be said that there was an implied agreement between A-MC and its employees that those who met or exceeded their quota would, by virtue of their election to the Hundred Club, receive additional compensation in the form of a vacation with expenses paid or prizes, or both, the amount thereof remained unknown and unknowable. In other words, not all of the events necessary to a determination of the amount to become due were present in the taxable years. Employees first learned of the form the additional *432 compensation was to take and the amount thereof in 1939 and 1940 and not in 1938 and 1939 when the credits to the reserve were made. Under the circumstances, the respondent was justified in disallowing as deductions the amounts claimed and in urging that deduction be limited to the amounts actually expended. Bauer Bros. Co. v. Commissioner, 46 Fed. (2d) 874. The essence of the adjustments made by the respondent is an abolition of the socalled reserve account. Inasmuch as we are not convinced that this was erroneous we decline to disturb his determination. Issue VIII Did the Commissioner err in refusing to allow deductions of amounts paid by A-MC in 1938 and 1939 to the National Industrial Information Committee of the National Association of Manufacturers? Findings of Fact A-MC paid $1,500 in 1938 and $750 in 1939 to the National Industrial Information Committee of the National Association of Manufacturers and deducted these amounts on its income tax returns for 1938 and 1939. The Commissioner disallowed the deductions on the ground that the amounts so paid constituted a contribution to an organization which is carrying on propaganda or otherwise attempting *433 to influence legislation within the meaning of section 23 (q) of the Internal Revenue Code. The payments of $1,500 in 1938 and $750 in 1939 are substantially less than 5 percent of the net income of A-MC for each of these years. The certificate of incorporation of the National Association of Manufacturers, provides, inter alia: "The general objects and purposes for which the said corporation is formed are the promotion of the industrial interests of the United States, the fostering of the domestic and foreign commerce of the United States, the betterment of the relations between employer and employee, the protection of the individual liberty and rights of employer and employee, the education of the public in the principles of individual liberty and ownership of property, the support of legislation in furtherance of those principles and opposition to legislation in derogation thereof. "The particular objects and purposes of said corporation are to establish and maintain a mutual and co-operative organization of American manufacturers in the United States for the fostering of their trade, business and financial interests, to reform abuses relative thereto, *434 to secure freedom from unlawful and unjust exactions, to diffuse accurate and reliable information as to the standing of merchants and other matters, to procure uniformity and certainty in the customs and usages pertaining to the trade, business and financial interests of the members of said corporation, to settle differences between its members, to promote a more enlarged and friendly intercourse between the manufacturers of the United States, and to do all things necessary to carry out the aforesaid purposes for the mutual benefit and protection of its members, under and subject to such regulations, conditions and limitations as may be prescribed by the By-Laws. * * * * *
"The corporation is not organized for pecuniary profit, and shall not make or declare dividends." In 1938 the National Association of Manufacturers submitted evidence to the Commissioner of Internal Revenue in support of its claim to exemption from filling Federal income tax returns. Among the evidence was an affidavit concerning the activities of the association which reads, in part, as follows: "In general * * * it may be said that the Association in all its activities is devoted to the promotion of *435 the industrial interests of the country, the fostering of domestic and foreign commerce, improvement of relations between employers and employees, public education as to the principles and functions of industry, and expressions of attitude with respect to legislation or other public policies or actions of direct interest to industry." The National Industrial Information Committee, sponsored by the National Association of Manufacturers, solicited the financial support of A-MC for a public information program entitled "Re-Selling THE AMERICAN WAY to America". This program had its inception in attacks upon industry because of the widespread distress and unemployment during the depression. It provided for the dissemination of information by radio, motion pictures, booklets, outdoor advertisements, newspapers and speakers concerning the American free enterprise system - its contribution to the building and the preservation of a democratic society and its promise for the future - and the need for "the preservation of the industrial system as a way of life, a way of both making a living and improving the standard of that living." The purpose of the program was "to regain full public regard *436 for industry." Opinion Petitioner claims the right to deduct the amounts paid to the committee under the provisions of section 23(a)(1) or 23(q) I.R.C.
This tribunal and the courts have heretofore allowed, as ordinary and necessary business expense, amounts contributed by railroads to an association conducting a campaign to create favorable public opinion. Texas & Pacific Ry. Co. v. United States, 52 Fed. (2d) 1040, affd. on another issue 286 U.S. 285; Los Angeles & Salt Lake R.R. Co., 18 B.T.A. 168; Kansas City Southern Ry. Co. et al., 22 B.T.A. 949, affd. 75 Fed. (2d) 786; Norfolk Southern Ry. Co., 22 B.T.A. 302, revs'd. on another point 63 Fed. (2d) 304, certiorari denied 290 U.S. 672; Missouri Pacific R. Co., 22 B.T.A. 267. In the cited cases the association, a voluntary organization, prior to World War I, had adopted a plan for correcting unsympathetic public opinion which was believed to impair the credit of railroads. After the war, the association renewed its plan for presenting the cause of railroads to the public by means of a *437 nation-wide advertising campaign. Each of the railroad's was allowed to deduct the amount contributed as an ordinary and necessary business expense. The purpose of the campaign of the committee to which petitioner contributed was to correct unsympathetic public opinion against manufacturers resulting from attacks upon industry because of unemployment during the depression. On the authority of the cited cases, we hold that respondent should have allowed the deductions claimed as ordinary and necessary business expenses. It is unnecessary to determine whether they may be allowed under section 23(q), supra. Issue IX Did the Commissioner properly include in the 1939 income of A-MC $7,947.58, representing the excess of the stated value of securities in a subsidiary Brazilian corporation over the cost of merchandise shipped to it in payment for such securities? In the alternative, was the transaction within the nonrecognition of gain or loss provisions of section 112(b)(5) I.R.C.? Findings of Fact In 1939 A-MC decided to do business in Brazil through a corporation to be known as the Addressograph-Multigraph do Brasil, S.A. (hereinafter referred to as the *438 Brazilian corporation). The Brazilian corporation was organized under the laws of Brazil on September 19, 1939. Its articles of incorporation provided that Valentine F. Boucas was to subscribe to 60 percent of its stock and A-MC the remaining 40 percent and that A-MC's subscription was to be paid in the form of merchandise. Prior to the organization of the Brazilian corporation, A-MC's business in Brazil was handled by a Brazilian division in charge of Boucas. At or about the time it was organized, a private agreement was entered into between Boucas and A-MC, which set out the special obligations to be assumed by Boucas as president of the corporation, and by A-MC. It was agreed, inter alia, that the Brazilian corporation was to receive the entire merchandise stock of the Brazilian division of A-MC (except the articles covered by the last drafts payable); that merchandise of the value of 480 contos of reis received from the Brazilian division would be for the account of Boucas; that the Brazilian corporation would pay for the remainder in 24 equal installments; that it would debit A-MC for the cash value of its stock subscription of 400 contos of reis and credit A-MC for the cost *439 value in dollars of merchandise "imported lately as per drafts". The arrangement was that the drafts for the shipments already imported, and others for shipments coming in later, should be delivered to the Brazilian corporation "* * * free of payment up to the total amount of its [A-MC's] debt for Four hundred contos of reis * * *". In September 1939, A-MC subscribed for 40 percent of the stock of the Brazilian corporation, par value 400 contos of reis, to be paid in merchandise. The other subscriber was Boucas, who subscribed for 60 percent of the stock payable 48 percent in merchandise, valued on the same basis as that paid in by A-MC, and 12 percent in contos of reis. During 1939, merchandise shipped to Brazil and applied to the above subscription was billed at $20,468.19 in United States money. The amount, converted at the applicable current rates, resulted in a credit against the subscription account of 395.88 contos of reis. The balance of 4.12 contos of reis was paid in 1940 by the shipment of goods billed at $212.01 in United States money. In filing its 1939 income tax return, A-MC eliminated from income the gross profit on merchandise applied against subscription to *440 stock in the Brazilian subsidiary. The Commissioner included in gross income the profit on the merchandise shipped to the Brazilian corporation, computed as follows: Selling price
(Amount of subscription to stock)
$20,468.19
Cost
12,520.61
Gross profit
$ 7,947.58
Opinion Petitioner contends it realized no taxable gain because the cost of the stock of the Brazilian corporation was the cost of the merchandise delivered as payment in kind. In the alternative, it contends it realized no taxable gain because the transaction falls within the non-recognition of gain or loss provisions of section 112(b)(5) I.R.C. We agree with neither contention. Petitioner incurred a fixed obligation to subscribe to stock of the new Brazilian corporation in the amount of 400 contos of reis. It satisfied the major portion of this obligation with merchandise, which it billed to the corporation at $20,468.19. The equivalent of this amount in Brazilian money was credited to its account. The merchandise had a cost basis to A-MC of $12,520.61. The tax consequence of such a transaction is no different than it would have been if A-MC had sold the merchandise for *441 $20,468.19 and used the proceeds of the sale to pay its indebtedness. In either case it realized a gain represented by the difference between $20,468.19 and $12,520.61, or $7,947.58. Even if it be assumed that the substance of the transaction was that petitioner exchanged property for stock of the new corporation the taxable result would not be changed since in that event the realized gain would be the difference between the cost basis of the merchandise transferred and the value of the stock received in the exchange. The cost basis of the merchandise is not in dispute. The value of stock issued in exchange for assets may be measured by the value of the assets received, where a corporation had no assets and no outstanding stock or liabilities prior to the exchange. Record Petroleum Co., 32 B.T.A. 1270. The best evidence of the value of the assets is the price at which they were billed to the Brazilian corporation and credited to the account of A-MC, namely, $20,468.19. Under this view the realized gain of A-MC would also be $7,947.58. Section 112(b)(5), I.R.C., upon which petitioner relies in support of its alternative contention, provides *442 that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation; but "in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange." The facts, all of which were stipulated, disclose that both A-MC and Boucas agreed to transfer property to the new Brazilian corporation in exchange for stock, and that A-MC made such a transfer. Respondent urges that the evidence does not disclose what interest Boucas had in the property transferred to the new corporation, or that his interest in that corporation after he received his 60 percent stock interest compared proportionately with his interest in the property acquired by the corporation prior to the exchange. While the evidence is not clear, it indicates that the property which was transferred to the new corporation for the account of Boucas formerly belonged to the Brazilian division of A-MC. If Boucas had any proprietary interest in this property, it has not been shown. *443 Without evidence that he owned it, we cannot find that the stock interest he acquired was substantially in proportion to his interest in the property of the corporation prior to the exchange. Our conclusion is that the respondent did not err in including the $7,947.58 in petitioner's gross income. Issue X (a) Did the Commissioner properly refuse to include a payment of $150,000 on indebtedness in determining the amount of the dividends paid credit for computation of the surtax on undistributed profits of A-MC for 1939 under section 27(a)(4) of the Code as amended by section 222 of the 1939 Act? (b) What is the amount of the dividend carry-over from 1938 to which A-MC is entitled in computing its "dividends paid credit" for purpose of the surtax on undistributed profits in 1939? (c) (1) Did the Commissioner properly limit the "dividends paid credit" for the year 1937 to $20,954.25 - the amount of dividends actually paid - for the computation of the surtax on undistributed profits of S-Del, and did he err in refusing to allow such credit to the full extent of its earnings? (2) Should the "dividends paid credit" for 1937 include a dividend carry-over from the year 1936 of $3,509.27? *444 Findings of Fact (a) On December 31, 1937, A-MC had an outstanding indebtedness of $1,700,000 owing to unregistered debenture holders under a trust indenture in which the Old Colony Trust Company of Boston, Massachusetts, was the trustee. These debentures were part of an issue of $2,000,000 face value serial debentures, sold to the general public through Estabrook and Company of Boston, Mass., about April 1, 1935. They were to be paid serially, beginning with $150,000 on April 1, 1936, and ending with $400.000 on April 1, 1945. The interest rate varied from 3% on the first $150,000 to 5 1/2% on the last $800,000. A-MC paid off $150,000 principal amount in 1936 and another $150,000 principal amount in 1937, leaving a balance outstanding of $1,700,000 at December 31, 1937. $150,000 was duly paid on the series becoming due April 1, 1938. On December 1, 1938, A-MC negotiated a loan for $2,500.000 from the Equitable Life Assurance Society of the United States, which is evidenced by debentures bearing a uniform rate of interest of 3 5/8%, maturing serially beginning with $150,000 on December 1, 1939, and ending fifteen years later with a maturity of $400,000 on December 1, 1953. Part *445 of the proceeds of the loan from Equitable Life was used to pay off the balance of $1,550,000 of the debentures issued in 1935, which were called at a premium of $42,500. The $1,550,000 used to pay off the 1935 bond issue and the $150,000 used to pay the series which came due April 1, 1938, were included by A-MC in the computation of its dividends paid credit in Schedule N of its 1938 return. This had no effect on its tax liability, however, because dividends paid in 1938 were in excess of the adjusted net income. On December 1, 1939, $150,000 was paid on the debentures issued as of December 1, 1938, and A-MC claims this amount as a dividends paid credit. The credit claimed has been disallowed by the Commissioner on the ground that the debentures issued in 1938 were not in renewal of the indebtedness existing on December 31, 1937. Opinion Section 26 I.R.C. provides for the allowance of specified credits to corporations, one being a "Dividends Paid Credit." Section 27 provides that the term "dividends paid credit" means the sum of several items specifically described therein. Subdivision (4) of section 27, as amended by section 222(a) of the Revenue Act *446 of 1939, is as follows: (4) Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind, if such amounts are reasonable with respect to the size and terms of such indebtedness. As used in this paragraph the term "indebtedness" means only an indebtedness of the corporation existing at the close of business on December 31, 1937, and evidenced by a bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust, issued by the corporation and in existence at the close of business on December 31, 1937, or by a bill of exchange accepted by the corporation prior to, and in existence at, the close of business on such date. Where the indebtedness is for a principal sum, with interest, no credit shall be allowed under this paragraph for amounts used or set aside to pay such interest. A renewal (however, evidenced) of an indebtedness shall be considered an indebtedness. The theory of the Commissioner, as expressed in his regulations under the undistributed profits tax of 1936 and 1938 (Sec. 26 and 27, Rev. Acts of 1936 and 1938 and corresponding sections I.R.C.) [9] and under the provisions subjecting personal holding company income to surtax (Sec. 351(b)(2)(A), *447 Rev. Act of 1936; sec. 405(b) Rev. Act of 1938), [10] has always been that so long as the creditor remains the same there may be - depending on the facts - a renewal of the obligation, payment on which will entitle the taxpayer to the credit claimed. Thus he now cites the portion of his regulation denying such credit where "for example, * * * money is borrowed from A to pay B." We declined to approve such an interpretation in Sun Pipe Line Co., 42 B.T.A. 1413, expressing the conclusion that the credit should be denied only when the indebtedness upon which payment is made is "new in an economic sense to the taxpayer." The Circuit Court of Appeals for the Third Circuit affirmed ( Commissioner v. Sun Pipe Line Co., 126 Fed. (2d) 888. In a later case, in which the Commissioner "tacitly asked that the Sun Pipe Line Co. decision be overruled", the same court stated it was "still convinced that the result there reached is sound." B. D. Phillips, Inc. v. Commissioner, 134 Fed. (2d) 73. It interpreted the earlier decision as meaning that "indebtedness", as used in the statute, "referred merely to an amount owing both prior to and after the date specified; *448 the fact that the identity of the obligees of that indebtedness may have changed was considered to be of no consequence." The Circuit Court of Appeals for the Second Circuit expressed agreement with this principle in Commissioner v. Grant Trading Co., Inc., 135 Fed. (2d) 358. Respondent cites an unpublished memorandum opinion of this tribunal, which, he contends, supports his view. It has now been affirmed, the facts and a portion of the opinion being set out in General Plastics et al. v. Commissioner, 145 Fed. (2d) 731 (November 16, 1944). The taxpayer in that case, being indebted to a bank in the amount of $400,000, paid this amount on the same day that it borrowed from the same institution $500,000. Adopting in essence the same postulate that the Commissioner would have us adopt here, viz., that the old debt existing on December 31, 1937, had been paid, it claimed a dividends paid credit. It was pointed out that "the new indebtedness is not new in any economic sense, but a replacement *449 and continuation of the old." The claimed deduction was therefore disallowed. Consistency requires that credit under sec. 27(a)(4) be allowed at the time the renewed obligation is paid and retired. The following table depicts the sequence of the events shown in our findings: Indebtedness existing Dec. 31, 1937
$1,700,000
Indebtedness paid April, 1938
150,000
Indebtedness existing Dec. 1, 1938
1,550,000
Additional amount borrowed Dec. 1, 1938
950,000
Total Bonded Indebtedness Dec. 31, 1938
2,500,000
Payment made Dec. 1, 1939
150,000
Petitioner's contention that the entire amount paid on December 1, 1939, should be held to have been a payment on the $1,700,000 indebtedness existing on December 31, 1937, is as unsound as respondent's contention that none of the amount paid was in liquidation of that indebtedness. In our judgment 155/250ths of the amount paid reduced the December 31, 1937, indebtedness while 95/250ths was applied toward the reduction of the amount borrowed December 1, 1938. It is accordingly held that petitioner is entitled to a dividends paid credit under section 27(a)(4), supra, as amended by section 222(a) of the Revenue Act of 1939, in *450 the amount of $93,000. (b) In paragraph 4 of (1) of the petition in Docket 111395, it is alleged that the respondent incorrectly determined the dividends paid credit for 1939 by using the incorrect net income for the year 1938 in determining the dividend carry-over. In a "Stipulation for Settlement of Issues" respondent confesses error and agrees that petitioner is entitled to a credit for dividend carry-over in determining the dividends paid credit for the year 1939. Since the correct amount of such dividend carry-over cannot be ascertained until all adjustments required by the foregoing agreements and the final decision of this court have been made, the parties have agreed that this issue be reserved for settlement under the Rule 50 computation. Finding of Fact and Opinion (c)(1) and (2) S-Del paid dividends in the amount of $20,954.25 during the taxable year 1937 and the Commissioner allowed this amount as a dividends paid credit. He now concedes that it is entitled to have its dividends paid credit, as shown in the deficiency notice, increased by the dividend carry-over from 1936 in the amount which may be available after all adjustments required by the stipulation *451 for settlement of issues have been made. The amount of such dividend carry-over cannot be determined at this time and is reserved for settlement under Rule 50 computation. Petitioner contends that, in addition to the $20,954.25 dividends paid credit for dividends actually paid during the taxable year 1937 and the dividend carry-over from 1936 which the Commissioner concedes should be included in the dividends paid credit, it is also entitled to an additional credit for "amounts distributed in liquidation", which are properly chargeable to the earnings or profits accumulated after February 28, 1913. The taxable net income for income tax computations, entered as item 23, page 1 of the 1937 corporation income and excess-profits tax return of S-Del, was $48,242.68. It was dissolved on December 30, 1937, and all of its remaining assets were distributed during 1937. Just prior to the distribution of its assets, its balance sheet (attached to its 1937 income tax return as schedule "M", page 5) showed a paid-in or capital surplus of $577,680 and a deficit in earned surplus and undivided profits of $55,200.54. Section 27(f) of the Revenue Act of 1936 upon which the present claim is based, *452 allows an additional credit for amounts distributed in liquidation which are "* * * properly chargeable to the earnings or profits accumulated after February 28, 1913 * * *." The balance sheet for the year 1937 shows that petitioner had a deficit at the date of liquidation of $55,200.54 in earned surplus and undivided profits. While, as petitioner points out, its return shows it had net income in 1937 of $48,242.68, this amount did not represent earnings and profits accumulated since February 28, 1913, because at the time this net income was realized a deficit existed in its accumulated earnings and profits, which exceeded the amount of 1937 net income. The latter amount, to the extent that it was not distributed to stockholders as dividends, together with several other items not necessary to enumerate, simply reduced the deficit in earned surplus and undivided profits from $74,047.16 as of December 31, 1936, to $55,200.54 as of the close of the year 1937. Our conclusion is, therefore, that unless the adjustments to income of prior years or of 1937, the year of liquidation - some of which are in issue and some of which have been settled by the parties - result in overcoming the deficit *453 of $55,200.54, the petitioner is not entitled to any additional credit under section 27(f), supra. In other words, additional credit to the extent indicated will be allowed if recomputation under Rule 50 justifies such allowance. Issue XI Are any refunds due the several petitioners? The question is a general one, not discussed at any length by either party. It has probably become moot; for both parties state it is probable deficiencies in tax will result in each case. If not, the basic facts are all before us, one of the stipulations showing the dates the returns were filed, the dates and amounts of tax payments, and the dates of the filing of the several original and amended claims. The claims are all attached. Under the circumstances we deem it unnecessary to set out all of the facts or to express any conclusion as to the validity, timeliness, or effect of the several claims. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Addressograph Company, Addressograph-Multigraph Corporation; Multigraph Company, Addressograph-Multigraph Corporation; Speedaumat Manufacturing Company, Addressograph-Multigraph Corporation; Addressograph-Multigraph Corporation, Transferee-Addressograph Company; Addressograph-Multigraph Corporation, Transferee-Multigraph Company; and Addressograph-Multigraph Corporation, Transferee-Speedaumat Mfg. Co.↩
2. Figures in parentheses indicate red or minus amounts.↩
*. Error in addition. Should be $4,764,457.70.↩
*. Smith, Hencke and Sulliva5 were assistants to Richter at various times. One-half of the salaries paid to Richter and his assistants are claimed as additional patent costs. ↩
**. The compensation paid to Hubbard was included in the expense of operating the engineering department.↩
*. Only half of salary of F. E. Curtis is included on the theory that he devoted approximately fifty percent of his time to development work. ↩
**. The salary of H. C. Osborn during the period from 1931 to 1935, inclusive, when he was vice president, amounting to $109,299.60, was charged to officers' salaries and not to engineering. During 1936 to 1939, inclusive, when he was on a retainer of $15,000 per annum his salary was charged to the Engineering Department. The amounts paid to the other supervising engineers were charged to the Engineering Department.↩
*. The actual cost of the Jackson patent was $1,200.00 and of the Schaffer patent $5,000. $160 of the first mentioned and $333.28 of the latter had been eliminated by amortization in 1928.↩
*. These four items cover expenditures made in connection with infringement suits some of which were brought by and some against petitioners.↩
4. See e.g. Art. 23 (1)-7, Regulations 94. ↩
5. ART. 23 (1)-8. (Regulations 94) Depreciation of drawings and models. - If a taxpayer has incurred expenditures in his business for designs, drawings, patterns, models, or work of a experimental nature calculated to result in improvement of his facilities or his product, and if the period of usefulness of any such asset may be estimated from experience with reasonable accuracy, it may be subjectofo depreciation allowances spread over such estimated period of usefulness. The facts must be fully shown in the return or prior thereto to the satisfaction of the Commissioner. Except for such depreciation allowances no deduction shall be made by the taxpayer against any sum so set up as an asset except on the sale or other disposition of such asset at a loss or on proof of a total loss thereof.↩
7. The depreciation schedules are not attached to the copies of returns introduced in evidence.↩
8. This is the amount shown by Ex. 9, although Ex. 8 shows $393,820.68.↩
9. Article 19.27 (a)-3, Regulations 103.↩
10. See Regulations 94 and 101 quoted in foot-note to B. D. Phillips, Inc. v. Commissioner, 134 Fed. (2d) 73↩.